**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

LEAGUE OF UNITED LATIN
AMERICAN CITIZENS,
1776 Eye Street, NW, Suite 400
Washington, DC 20006;

SECURE FAMILIES INITIATIVE,
1301 K Street NW, Suite 300W
Washington DC 20005;

ARIZONA STUDENTS' ASSOCIATION,
2121 S Mill Avenue, Suite 105
Tempe, AZ 85282,

   *Plaintiffs*,

    v.

EXECUTIVE OFFICE OF THE
PRESIDENT,
1600 Pennsylvania Avenue NW
Washington, DC 20500;

UNITED STATES POSTAL SERVICE,
475 L'Enfant Plaza SW
Washington, DC 20260;

BOARD OF GOVERNORS OF THE
UNITED STATES POSTAL SERVICE,
475 L'Enfant Plaza SW
Washington, DC 20260;

AMBER F. MCREYNOLDS, *in her official
capacity as Chair of the Board of
Governors of the United States Postal
Service*,
475 L'Enfant Plaza SW
Washington, DC 20260;

Case No. _____

DEREK T. KAN, *in his official capacity as Vice Chairman of the Board of Governors of the United States Postal Service*,
475 L'Enfant Plaza SW
Washington, DC 20260;

RONALD A. STROMAN, *in his official capacity as Member of the Board of Governors of the United States Postal Service*,
475 L'Enfant Plaza SW
Washington, DC 20260;

DANIEL M. TANGHERLINI, *in his official capacity as Member of the Board of Governors of the United States Postal Service*,
475 L'Enfant Plaza SW
Washington, DC 20260;

DAVID P. STEINER, *in his official capacity as United States Postmaster General*,
475 L'Enfant Plaza SW
Washington, DC 20260;

UNITED STATES DEPARTMENT OF HOMELAND SECURITY,
2707 Martin Luther King Jr Avenue SE
Washington, DC 20528;

MARKWAYNE MULLIN, *in his official capacity as Secretary of Homeland Security*,
2707 Martin Luther King Jr Avenue SE
Washington, DC 20528;

UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES,
5900 Capital Gateway Drive
Camp Springs, MD 20588;

JOSEPH EDLOW, *in his official capacity as Director of United States Citizenship and Immigration Services*,
5900 Capital Gateway Drive
Camp Springs, MD 20588;

UNITED STATES SOCIAL SECURITY
ADMINISTRATION,
6401 Security Boulevard
Woodlawn, MD 21207;

FRANK J. BISIGNANO, *in his official
capacity as Commissioner of the Social
Security Administration*,
6401 Security Boulevard
Woodlawn, MD 21207;

UNITED STATES DEPARTMENT OF
COMMERCE,
1401 Constitution Avenue NW
Washington, DC 20230;

HOWARD LUTNICK, *in his official
capacity as Secretary of Commerce*,
1401 Constitution Avenue NW
Washington, DC 20230;

UNITED STATES DEPARTMENT OF
JUSTICE,
950 Pennsylvania Avenue NW
Washington, DC 20530;

PAMELA J. BONDI, *in her official
capacity as U.S. Attorney General*,
950 Pennsylvania Avenue NW
Washington, DC 20530,

       *Defendants*.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**INTRODUCTION**

1. "[O]ur Constitution entrusts Congress and the States—not the President—with the power to regulate federal elections." *LULAC v. Exec. Office of the President*, 808 F. Supp. 3d 29, 41 (D.D.C. 2025) *("LULAC I")*. Despite this clear constitutional command, on March 31, 2026, the President issued an Executive Order (the "EO" or "Order") entitled "Ensuring Citizenship Verification and Integrity in Federal Elections." But this Order, like the President's previous unsuccessful endeavor,[1] is an unlawful attempt to exercise powers that the Constitution withholds from him and instead assigns to the states and to Congress. The Order violates and subverts the separation of powers by lawlessly arrogating to the President authority to declare election rules and dictate election administration outcomes down to the individual voter by executive fiat. And the Order not only treads into a field entirely outside the President's power, but in doing so, acts contrary to numerous laws, including but not limited to the Privacy Act and those governing the administration and functions of the United States Postal Service.

2. The Order is an attack on the constitutionally mandated checks and balances that keep American elections free and fair. Through this unconstitutional action, the President intrudes on the states' and Congress's authority to set election rules, as well as state and local officials' authority to administer elections, and interferes with the independence of the USPS in an attempt to make it far more difficult for eligible U.S. citizens to exercise their fundamental right to vote.

3. This is not the President's first attempt to usurp unauthorized control over federal elections. Just over one year ago, the President issued Executive Order 14248, entitled "Preserving

---

[1] *See LULAC I*, 808 F. Supp. 3d at 72-79 (finding that Executive Order 14248, which *inter alia* ordered the Election Assistance Commission to impose a documentary proof of citizenship requirement on the National Mail Voter Registration Form, violated the Constitutional separation of powers and was ultra vires).

and Protecting the Integrity of American Elections," which purported to take control over the states' voter registration and mail ballot processes by requiring documentary proof of citizenship and setting ballot receipt deadlines, among other provisions. Exec. Order No. 14248, 90 Fed. Reg. 14005 (Mar. 25, 2025) ("March 2025 Voting EO"). On March 31, 2026—the day the challenged Order was issued—this Court rendered final judgment against Executive Order 14248, holding that it violated the Separation of Powers. Final Judgment, *League of United Latin Am. Citizens v. Exec. Off. of the President*, 1:25-cv-00946-CKK (D.D.C. Mar. 31, 2026), ECF No. 256. With the challenged Order, the President again seeks to enlarge his role in federal elections, with no legal authority to support the action.

4.      This Order is the culmination of the administration's months-long effort to unlawfully and hastily build a nationwide citizenship database. Prior to the Order's enactment, the United States filed lawsuits against 30 states, plus the District of Columbia, over their refusal to produce unredacted voter rolls, including driver's license numbers and social security numbers. Every court that has heard these cases thus far has dismissed the United States's complaints. *See United States v. Weber*, --- F. Supp. 3d ---, No. 2:25-cv-09149-DOC-ADS, 2026 WL 118807, at *8 (C.D. Cal. Jan. 15, 2026) (granting motions to dismiss United States's complaint in California); *United States v. Oregon*, --- F. Supp. 3d ---, No. 6:25-cv-01666-MTK, 2026 WL 318402, at *13 (D. Or. Feb. 5, 2026) (granting motions to dismiss United States's complaint in Oregon); *United States v. Benson*, --- F. Supp. 3d ---, No. 1:25-cv-1148, 2026 WL 362789, at *11 (W.D. Mich. Feb. 10, 2026) (granting motions to dismiss United States's complaint in Michigan).

5.      Plaintiffs League of United Latin American Citizens, Secure Families Initiative, and Arizona Students' Association bring this Complaint challenging certain provisions of the Order

2

that are facially unlawful and which, if implemented, would severely burden their protected civic engagement activity and their members' right to vote.

6.      This Court should once again declare that the President has no role in the administration of elections and that the challenged provisions of this Executive Order violate the United States Constitution and enjoin Defendants from taking unlawful actions to enforce its lawless mandates. Nothing less is required to prevent further encroachments on Americans' access to the ballot and confidence in the independent and fair administration of our elections.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction to hear this case under 28 U.S.C. § 1331 because the claims in this action arise under the laws of the United States, as well as under 28 U.S.C. §§ 1651, 2201, and 2202, and 39 U.S.C. § 409.

8.      Venue is proper in this district under 28 U.S.C. § 1391(b) because at least one Defendant resides in this district.

## PARTIES

I.      **Plaintiffs**

9.      Plaintiff **League of United Latin American Citizens ("LULAC")** is a nationwide, non-profit, non-partisan, membership-based organization with more than 400 councils (local chapters) and over 570,000 members, with members in every state in the country. LULAC was established in 1929 and has its headquarters in Washington, D.C.

10.      LULAC is the largest and oldest Latino civil rights organization in the United States. LULAC's mission is to improve the lives of Latino families throughout the United States and to protect their civil rights, including voting rights.

3

11.    LULAC advances the economic condition, educational attainment, political influence, housing, health, and civil rights of Hispanic Americans through community-based programs operating at more than 500 LULAC councils nationwide.

12.    LULAC's members include both U.S. born citizens and naturalized citizens. LULAC provides citizenship application assistance and civics and citizenship education to its members, many of whom are immigrants.

13.    LULAC's members are civically engaged. Approximately 70% are registered to vote, and nearly 80% of LULAC's registered members voted in 2020 and approximately 62% voted in 2022. Many LULAC members choose, state law permitting, to vote by mail.

14.    Throughout the year, LULAC's councils register prospective voters and hold voter registration drives at naturalization ceremonies, schools, churches, and other community events. At these events, LULAC councils often, at the request of registrants, collect voter registration forms and return them to local election offices in accordance with state law. In states where vote-by-mail is available, LULAC councils also help their members and other voters to apply for absentee ballots.

15.    LULAC holds get-out-the-vote programs before elections to encourage its members to vote, including educating their members and other voters about vote-by-mail applications and vote-by-mail deadlines. State law permitting, LULAC encourages absentee or mail-in voting, as many LULAC members have difficulty voting in person because they are elderly or have medical issues, live in rural areas, or do not have reliable access to transportation, among other reasons.

16.    Plaintiff **Secure Families Initiative ("SFI")** is a non-partisan, 501(c)(4) non-profit organization, comprising military spouses and family members.

4

17. SFI began under an incubation program in January 2020 and then became a standalone non-profit in January 2021. SFI is incorporated in Washington, D.C., and has five full-time staff members, approximately two part-time staff members, and over 44,000 members. Member families are also posted to military bases within the United States. Because SFI's membership comprises active-duty spouses and dependents, they face particular challenges to voter access, including the need to vote by mail ballot, often from overseas.

18. Many SFI members register and vote using procedures outlined in the Uniformed And Overseas Citizens Absentee Voting Act ("UOCAVA"). Voting is more complicated for military and overseas voters, like SFI's members, because they move frequently and often must vote by mail because they are stationed away from their jurisdiction of residence. As such, SFI members often legally maintain residency in their home state for the purposes of exercising their right to vote, but do not maintain a regular presence in that state.

19. SFI's membership base is transient, but the most recent records indicate that SFI has members residing or registered to vote in the District of Columbia and every state other than Vermont. This includes military families serving abroad in at least sixteen countries. SFI's members include registered voters planning to vote by mail and in person. These members face various barriers to access, such as frequent moves, overseas assignments, and confusion over where and how to cast their ballots. SFI has worked and continues to work to inform its members, including those stationed overseas and across the United States, about how to register to vote and request and cast their ballots.

20. SFI's mission is to mobilize diverse military partners, parents, children, and veterans to vote and advocate for their communities. Recognizing that military families make enormous sacrifices to strengthen and defend our country, SFI seeks to influence issues of foreign

5

policy and national security that especially impact SFI's members. SFI believes that mobilizing its community to vote and advocate is the most effective way to reshape the country's conversations around military intervention and ensure its members have a seat at the table over decisions that affect their own lives.

21.      Additionally, SFI advocates for federal and state policies that increase accessibility for absentee voters and registered military-affiliated voters. For example, SFI has endorsed federal legislation that would study the efficacy of the Department of Defense's Voter Assistance Officer[2] program; ensure that applicable ballot return deadlines for UOCAVA ballots across the U.S. will not disenfranchise voters; and require all 50 states to provide UOCAVA voters with a ballot curing process. On the state level, SFI has consistently pushed for the expansion of electronic ballot return opportunities for UOCAVA voters.

22.      Plaintiff **Arizona Students' Association ("ASA")** is a non-partisan, non-profit membership organization based in Arizona. ASA is student-led and represents the collective interest of the over 180,000 university students and over 400,000 community college students in Arizona. The organization advocates at the local, state, and national levels for the interests of students. As a part of its mission, ASA encourages students throughout Arizona to register to vote and helps them register in various ways, including through voter registration drives and online registration. ASA encourages students to vote by mail to allow students time to review their ballots and cast an informed vote. ASA also engages in direct advocacy to state and local legislators, the Arizona Board of Regents, and university administrators.

---

[2] Voting Assistance Officers provide information and assistance to military and overseas voters regarding voter registration, absentee ballot procedures, and their voting rights under the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"). 10 U.S.C. § 1566a; *see also Voting Assistance Officers*, Fed. Voting Assistance Program, https://perma.cc/HQ69-GDFL (last visited Apr. 1, 2026).

6

23. ASA employs four full-time staff members, as well as part-time campus organizers and dozens of student fellows who are paid a stipend. Those staff members, as well as volunteers, spend a significant amount of their time working on ASA's voter registration efforts, and helping ensure that members are properly registered and are able to receive and return their ballots. They also help organize ASA's conferences and student information sessions, and its advocacy projects across the state and in Washington, D.C.

24. ASA's members are students of all backgrounds throughout Arizona. These students are young adults who are just becoming eligible to vote and therefore must register for the first time at a new address. Many students who are already registered are often voting away from home for the first time or may change addresses frequently while a student. Students also face special hurdles navigating voter registration systems and often rely on mail voting either because they cannot take time off to vote on Election Day or because they remain registered to vote at a location different from where they are attending college or university.

25. At its drives and events, ASA staff and volunteers guide students through the registration process, answer questions, and ensure students are properly registered and will receive a ballot by mail if they are registered to do so. Last year, ASA registered approximately 3,500 students at those drives. ASA encourages students to register to vote by mail, and a high percentage do so.

## II. Defendants

26. The Executive Office of the President is a federal agency headquartered in Washington, D.C.

27. The United States Postal Service ("USPS" or "Postal Service") is an independent agency of the federal government "operated as a basic and fundamental service provided to the

people by the Government of the United States, authorized by the Constitution, created by Act of Congress, and supported by the people." 39 U.S.C. § 101.

28.     The Board of Governors of USPS is responsible for directing and controlling the expenditures, reviewing the practices and policies of the USPS, and performing other legal duties. 39 U.S.C. § 205(a). The Board acts upon majority vote of members present, and any six members constitute a quorum. 39 U.S.C. § 205(c).

29.     Amber F. McReynolds is the Chair of the Board of Governors of USPS. She is sued in her official capacity.

30.     Derek T. Kan is the Vice Chairman of the Board of Governors of USPS. He is sued in his official capacity.

31.     Ronald A. Stroman is a Member of the Board of Governors of USPS. He is sued in his official capacity.

32.     Daniel M. Tangherlini is a member of the Board of Governors of USPS. He is sued in his official capacity.

33.     David P. Steiner is the United States Postmaster General and an *ex officio* Member of the Board of Governors of USPS. The Postmaster General is the chief executive officer of USPS and actively manages the day-to-day operations of USPS. *See* 39 U.S.C. § 203. He is sued in his official capacity.

34.     The United States Department of Homeland Security ("DHS") is a cabinet-level agency of the United States, responsible for immigration and customs, providing immigration benefits, and establishing policies for lawful immigration in the United States.

35.     Markwayne Mullin is the Secretary of the Department of Homeland Security. He is sued in his official capacity.

8

36.     The United States Citizenship and Immigration Services ("USCIS") is a federal agency housed in DHS and is responsible for processing naturalization applications and establishing related policies.

37.     Joseph Edlow is the Director of USCIS. He is sued in his official capacity.

38.     The United States Social Security Administration ("SSA") is a United States government agency that administers Social Security, a social insurance program consisting of retirement, disability, and survivor benefits.

39.     Frank J. Bisignano is the Commissioner of the Social Security Administration. He is sued in his official capacity.

40.     The United States Department of Commerce ("DOC") is an executive branch agency responsible for supporting economic growth within the United States. Its functions include promoting job creation, sustainable business development, and ensuring economic competitiveness.

41.     Howard Lutnick is the Secretary of the Department of Commerce. He is sued in his official capacity.

42.     The United States Department of Justice ("DOJ") is an agency of the federal government headquartered in Washington, D.C.

43.     Pamela J. Bondi is the Attorney General of the United States. She is sued in her official capacity.

## FACTUAL ALLEGATIONS AND LEGAL BACKGROUND

### I.     The Executive Order Issues Lawless Directives to Federal Agencies

44.     On March 31, 2026, President Trump issued an Executive Order titled "Ensuring Citizenship Verification and Integrity in Federal Elections."

45.     The Order purports to enforce federal laws "prohibit[ing] non-citizens from registering to vote or voting in Federal elections," but in fact mandates the creation and maintenance of various federal lists comprising unlawful registries of U.S. citizens and unconstitutionally intrudes into areas of election policymaking and administration reserved by the Constitution to the states and Congress.

46.     The Order also purports to "enhance election integrity via the United States Mail," but in fact directs the U.S. Postal Service to engage in functions it has not been authorized or equipped by Congress to conduct—indeed that Congress has prohibited—and unconstitutionally intrudes on the independent operation of the Postal Service and the power to regulate the mail the Constitution reserves to Congress alone.

47.     The Order directs the creation of three lists: the "State Citizenship List," the "State Mail Voter List," and the "USPS Mail-In and Absentee Participation Lists." The President lacks the authority to order the creation of any of these lists. The Order also directs the investigation and potential prosecution of individuals and entities that run afoul of the Order's various lists and mandated procedures requiring certain actions by and between voters, states, and USPS.

48.     Section 2(a) of the Order directs the creation of the so-called "State Citizenship List." This is to be a list of individuals confirmed to be U.S. citizens who will be 18 by the next federal election, and who "maintain a residence" in that state. The State Citizenship List is to be derived from federal citizenship and naturalization records, SSA records, SAVE data, and "other relevant Federal databases." The Order does not specify what other databases should be used to construct the State Citizenship List, or any steps that should be taken to verify the list's accuracy. As discussed further *infra*, there is no available federal data that could create an accurate and comprehensive list of U.S. citizens, particularly divided by state of residence. Not even close. And

even if such a "list" could be created, it would immediately become stale, as Americans turn 18, move, and naturalize every day.

49.    The Order directs the Secretary of Homeland Security—through the USCIS Director and in coordination with the Commissioner of SSA—to "compile and transmit" the state Citizenship List to the chief election official of each state. This transmittal must occur at least 60 days before a regularly scheduled federal election, or upon request by a state in advance of a special federal election.

50.    The Order also directs the Secretary of DHS to establish procedures to allow individuals to access their individual records and to update or correct them in advance of elections, and to enable states to "routinely supplement and provide suggested modifications or amendments" to the State Citizenship List. Order § 2(a). Additionally, the Order directs the Secretary of DHS to establish necessary infrastructure to compile, maintain, and transmit the State Citizenship List by June 29, 2026. Order § 4(c).

51.    Nothing in the order defines "Federal election" or limits it to general, rather than primary, federal elections. Federal primary elections are ongoing throughout the country.

52.    The Order does not directly specify anything that states should do with the State Citizenship List that they receive, but its context makes its goals exceptionally plain: States should limit voter registration and access to the ballot to those present on that list. First, the stated purpose of the list is to "assist in verifying identity and Federal election voter eligibility." Order § 1. Second, the Order directs the Attorney General to prioritize the investigation and prosecution of state and local officials or other election administration personnel who issue federal ballots to individuals who are not U.S. citizens, over 18 by the next election, and eligible to vote under state law, *i.e.* the qualifications the State Citizenship List purports to verify. Third, the section also instructs the

11

Attorney General to prioritize the investigation and prosecution of individuals or entities engaged in "aiding and abetting" the "printing, production, shipment, or distribution" of ballots to individuals who are not eligible to vote in a federal election. Order § 2(b). Such a threat could interfere with states' access to vendors to conduct their elections if they do not utilize the federal government's so-called State Citizenship List. That is particularly so given the Order's further directive to the Attorney General to "provide guidance to election officials, including any instrumentalities thereof; contractors; individuals involved in the administration of Federal elections; or public or private entities engaged in the printing production, shipment, or distribution of ballots" and, later on, encourages referral of those same entities for investigation or prosecution. Order § 4(b). Finally, the Order directs the Attorney General and the heads of all executive department and agencies to withhold federal funds from "noncompliant States and localities." Order § 5.

53.    Section 3 of the Order directs the Postmaster General to initiate a proposed rulemaking pursuant to 39 U.S.C. § 401 by May 30, 2026. Order § 3(b). The Order directs that the proposed rulemaking address several proscribed topics, and that any final rules on these topics be issued by July 29, 2026. Order § 3(d).

54.    The Order directs the Postmaster General to initiate a rulemaking that produces "at minimum," several specific items. First, a rule that all outbound ballot mail must be in an envelope marked as "Official Election Mail," that includes a unique "Intelligent Mail barcode," and has undergone a "mail envelope design review" by the USPS to ensure compliance with USPS mailing standards. Order § 3(b)(i).

55.    Second, the Order directs a rulemaking related to the second list contemplated by the Order: a list generated by each state of voters eligible to vote in a federal election to whom the

state intends to provide a mail or absentee ballot to be transmitted to the voter via USPS. Order § 3(b)(ii). This "State Mail Voter List" is intended to be provided by each state to USPS. The Order instructs the Postmaster General to propose a rule that specifies that at least 90 days prior to a federal election, a state may notify USPS if it intends to allow ballots to be sent to voters via USPS and whether it intends to submit the State Mail Voter List to USPS at least 60 days prior to a federal election. Order § 3(b)(ii). There is no indication in the Order of the significance of a state's choice to follow or not follow the optional choice to transmit a State Mail Voter List to USPS by a certain date. Nor is it clear what USPS should *do* with any such list.

56.     Third, the Order directs the creation of a rule requiring USPS to provide each state with a "Mail-In and Absentee Participation List"—the third list mandated by the Order. The Mail-In and Absentee Participation List is to include individuals "who are enrolled with the USPS, pursuant to a process specified in the rulemaking directed by this subsection, for mail-in or absentee ballots provided by such State," along with unique identifiers for each voter on the list. Order § 3(b)(iv).

57.     The Order also directs that the rule must prohibit USPS from transmitting a mail-in or absentee ballot for any individual not on the Mail-In and Absentee Participation List for their state. Order § 3(b)(iii). The Order also directs the proposed rule must enable each state to "routinely supplement" the state-specific Mail-In and Absentee Participation List in advance of a federal election, including by providing "suggested modifications or amendments" to the list. Order § 3(b)(v).

58.     Notably, although much of the Order is organized around the schedule of federal elections, nothing in Section (3)(b)(iii) or (iv) limits the Mail-In and Absentee Participation List or delivery prohibition to ballots for federal elections.

59. It is entirely unclear how this Mail-In and Absentee Participation List will be compiled; whether it will require "enrollment by the voter"; or whether it will relate to the other two lists contemplated by the Order. But, as discussed below, these details are somewhat beyond the point. The President has no authority to direct the creation of any such list or limit the delivery of mail based upon it.

60. The Order also directs USPS to coordinate with the USPS Office of the Inspector General and the Department of Justice for investigation of "suspected unlawful use of the mail involving Federal election materials." Order § 3(c). The Order does not define "election materials."

61. The Order instructs the Secretary of DHS, the Commissioner of SSA, and the Postmaster General to coordinate with the Secretary of Commerce to "effectuat[e] all relevant aspects" of the Order's implementation. Order § 4(a). It also directs the Attorney General to provide guidance to election officials and other relevant entities, Order § 4(b), and to take steps to "deter and address noncompliance" with federal law related to elections. Order § 5.

## II. The Executive Order Disturbs the Constitutional Framework for Elections

62. By design, the U.S. Constitution does not grant the President authority to regulate, superintend, or otherwise meddle in voter registration or the administration of elections.

63. The Constitution's Elections Clause grants states the power to determine "[t]he Times, Places and Manner of holding Elections for Senators and Representatives," and provides Congress the ability to "make or alter such Regulations." U.S. Const. art. I, § 4, cl. 1. The Constitution also grants Congress the power to "determine the Time of ch[oo]sing the Electors" for President and Vice President. U.S. Const. art. II, § 1, cl. 4.

64. Under the Elections Clause, the power and responsibility for setting rules for federal elections is shared between the states and Congress. The Elections Clause "invests the States with

responsibility for the mechanics of congressional elections, but only so far as Congress declines to preempt state legislative choices." *Foster v. Love*, 522 U.S. 67, 69 (1997) (citation omitted).

65.    The Supreme Court has long made clear that Congress's power over the "Times, Places and Manner" of congressional elections "is paramount, and may be exercised at any time, and to any extent which it deems expedient; and so far as it is exercised, and no farther, the regulations effected supersede those of the State which are inconsistent therewith." *Ex parte Siebold*, 100 U.S. 371, 392 (1879).

66.    Moreover, under the Voter Qualifications Clause, states have exclusive authority to define voter qualifications, including how to define residence. U.S. Const. art. I, § 2, cl. 1.

67.    As a result, residence for purposes of voting is specifically defined by state law and differs across states.

68.    Nowhere does the Constitution grant the President any power to dictate what constitutes residency for purposes of elections.

69.    The March 31, 2026 Order is not President Trump's first executive order on voting. Nor is it his first that overstepped the bounds that the Constitution places on the President when it comes to regulating federal elections.

70.    President Trump's first executive order on voting was issued on March 25, 2025. The March 2025 Voting EO purported to order several things including, *inter alia*, directing the Election Assistance Commission ("EAC") to issue a new federal registration form requiring documentary proof of citizenship ("DPOC"), ordering the Secretary of Defense to require DPOC on the Federal Post Card Application used by overseas miliary personnel, and instructing states to alter their ballot receipt deadlines or risk losing certain federal funding. In his first three months in office, the President also signed two other executive orders to enable an extraordinary

15

consolidation of data by the federal government. *See, e.g.*, Executive Order No. 14,158 (establishing a "Department of Government Efficiency); Executive Order No. 14,243 (requiring federal agencies to "rescind or modify all agency guidance that serves as a barrier to the inter- or intra-agency sharing of unclassified information").

71.    Several Plaintiffs, including LULAC, SFI, and ASA, sued to challenge the March 2025 Voting EO, alleging that the President lacked the authority asserted in the Executive Order. The Court agreed, and several key components of the March 2025 Voting EO were permanently enjoined. *See LULAC I*, 808 F. Supp. 3d 29 (appeal filed Dec. 23, 2025); *League of United Latin Am. Citizens v. Exec. Off. of the President*, No. CV 25-0946 (CKK), 2026 WL 252420, at *1 (D.D.C. Jan. 30, 2026) ("*LULAC II*") (appeal filed Mar. 30, 2026).

72.    Other courts have agreed and enjoined key provisions of the March 2025 Voting EO. Cases challenging the same Executive Order were filed in the District of Massachusetts, where California and 18 other states filed suit, *see California v. Trump*, No. 1:25-cv-10810-DJC (D. Mass. Apr. 3, 2025), and in the Western District of Washington, where two states filed suit, *see Washington v. Trump*, No. 2:25-cv-00602-JHC (W.D. Wash. Apr. 4, 2025). In *California v. Trump*, the court granted a preliminary injunction enjoining provisions of the March 2025 Voting EO. *See* Order of Prelim. Inj., No. 1:25cv10810-DJC (D. Mass June 13, 2025), ECF No. 108; Am. Order of Prelim. Inj., No. 1:25cv10810-DJC (D. Mass July 18, 2025), ECF No. 116; and denied a motion to dismiss the lawsuit, Mem. and Order, No. 1:25cv10810-DJC (D. Mass Sep. 17, 2025), ECF No. 132. Similarly, in *Washington v. Trump*, the court permanently enjoined multiple key provisions of the March 2025 Voting EO. *See* Order, No. 2:25-cv-00602-JHC (W.D. Wash. Jan. 9, 2026), ECF No. 126.

16

73.     In permanently enjoining significant portions of the March 2025 Voting EO, this Court was clear: "Because our Constitution assigns responsibility for election regulation to the States and to Congress . . . the President lacks the authority to direct" unilateral changes to our Nation's elections. *LULAC I*, 808 F. Supp. 3d at 41.

74.     Nonetheless, the Executive has repeatedly sought to usurp the power to control elections from the states, both through executive orders and through the consolidation of statewide voter data.

75.     In the summer of 2025, the United States began a widespread effort to obtain sensitive data on millions of Americans, purportedly to ensure that states are properly conducting list maintenance. Throughout the summer of 2025, DOJ sent letters to election officials in dozens of states demanding production of their unredacted statewide voter registration lists that contained sensitive information about every registered voter. Since sending those letters, the United States has engaged in an unprecedented effort to collect voters' sensitive data from almost every state in the country; it has sued 30 states and the District of Columbia to obtain that data.

76.     The United States did not make its plans for the sensitive voter data clear when it sent letters to the states or in its dozens of complaints in the lawsuits, even stating days before the EO that there was "no national [voter] database that's being created" in a hearing in Maine.[3] But the plan for the data has come into sharper relief through other sources, including a Memorandum of Understanding (MOU) DOJ signed with at least two states.[4] The MOU describes DOJ's

---

[3] Hr'g Tr. at 51:5-7, *United States v. Bellows*, No. 1:25-cv-468-LEW (D. Me. Mar. 26, 2026).
[4] *See* "Confidential Memorandum of Understanding" executed with Texas (Dec. 9, 2025), https://perma.cc/82T4-T48A; "Confidential Memorandum of Understanding" executed with Alaska (Dec. 22, 2025), https://perma.cc/5N9U-R5XV. DOJ has apparently asked other states to sign the same MOU. *See* Proposed "Confidential Memorandum of Understanding" sent to Colorado, https://www.documentcloud.org/documents/26330926-vrldata-sharing-agreement-doj-

17

attempted takeover of states' exclusive authority to maintain their voter rolls, explaining that DOJ will conduct an "analysis and assessment" of voter rolls and instruct the state to remove voters DOJ identifies.[5] Despite its statements to the contrary in court, DOJ's public statements confirm its goal is not to review list maintenance procedures, but to expand federal control over elections and target voters for removal. A recent press release stated: "At this Department of Justice, we will not permit states to jeopardize the integrity and effectiveness of elections by refusing to abide by our federal elections laws. If states will not fulfill their duty to protect the integrity of the ballot, we will."[6] According to one DOJ lawyer, Civil Rights Division leadership demanded that DOJ obtain "states' voter rolls, by suing them if necessary" to "go through all the data and compare it to the Department of Homeland Security data and Social Security data" and search for "immigrants that have registered to vote" even though "[t]here was no pre-existing evidence" that unlawful immigrant voting is a problem.[7] And DHS confirmed that it is using information received from DOJ to "scrub aliens from voter rolls."[8]

---

co/; *see also* Jonathan Shorman, *Trumps's DOJ Offers States Confidential Deal to Remove Voters Flagged by Feds*, Stateline (Dec. 18, 2025), https://stateline.org/2025/12/18/trumps-doj-offers-states-confidential-deal-to-wipe-voters-flagged-by-feds-as-ineligible/.

[5] The MOU provides that removals must take place within 45 days of notification from DOJ, which would violate, at minimum, Section 8(d) of the National Voter Registration Act, 52 U.S.C. § 20507(d), for any voters flagged for removal based on a change in residence.

[6] Press Release, Off. of Pub. Affs., U.S. Dep't of Just., Justice Department Sues Four Additional States and One Locality for Failure to Comply with Federal Elections Laws (Dec. 12, 2025), https://perma.cc/2R3L-YZ5X.

[7] Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department*, N.Y. Times Mag. (Nov. 16, 2025), https://perma.cc/3FVP-LABM. To the extent that DOJ is not engaging in an investigation and is instead engaging in data collection for any other purpose, DOJ must comply with the Paperwork Reduction Act, see 44 U.S.C. §§ 3506(c), 3507(a), and the Privacy Act, see 5 U.S.C. § 552a

[8] Jonathan Shorman, *DOJ is sharing state voter roll lists with Homeland Security*, Colo. Newsline (Sep. 15, 2025), https://coloradonewsline.com/2025/09/15/repub/doj-voter-roll-homeland-security/.

77. The Order now makes the United States's plans for the data crystal clear: the United States filed 31 lawsuits in states across the country and in the District of Columbia in an effort to build a nationwide citizenship database that it will foist upon states to use in elections, regardless of how unlawful and error-ridden that database is. DOJ confirmed it plans to run these state voter lists through SAVE, which will retain the data.

### III. The Privacy Act Exists to Protect Individual Americans from Federal Government Overreach

78. Congress passed the Privacy Act of 1974 in the wake of the excesses of the Watergate scandal to protect the privacy of individual Americans from accumulation of their private data within the federal government.

79. In furtherance of that goal, the Privacy Act is structured to prevent the federal government from creating "formal or de facto national data banks" or "centralized Federal information systems" that would consolidate sensitive personal data of Americans stored at separate agencies. S. Comm. on Gov't Operations and H.R. Comm. on Gov't Operations, 94th Cong., 2d Sess., Legislative History of the Privacy Act of 1974 – S. 3418 (Pub. L. No. 93-579), Source Book on Privacy, at 168 (1976), https://perma.cc/DZ4J-Y2TE.

80. The Privacy Act prevents intra-governmental data sharing, with a limited number of exceptions. 5 U.S.C. § 552a(b) ("No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains," unless one of 13 exceptions apply). One of those exceptions is for what is defined as a "routine use." The Privacy Act defines routine use as a use "for a purpose which is compatible with the purpose for which [the record] was collected."  5 U.S.C. § 552a(a)(7).

81.     The Privacy Act defines a "record" subject to the Act's protections broadly. A record, per the Act, means any item, collection, or grouping of information about an individual that is maintained by an agency, including, but not limited to, his education, financial transactions, medical history, and criminal or employment history and that contains his name, or the identifying number, symbol, or other identifying particular assigned to the individual, such as a finger or voice print or a photograph." *Id.* § 552a(a)(4).

82.     Congress implemented this limitation on data sharing in recognition that "the right to privacy is a personal and fundamental right protected by the Constitution of the United States" and "the privacy of an individual is directly affected by the collection, maintenance, use, and dissemination of personal information by Federal agencies." Privacy Act of 1974, Pub. L. No. 93-579, § 2, 88 Stat. 1896 (1974) (codified at 5 U.S.C. § 552a note).

83.     The Computer Matching and Privacy Protection Act of 1988 amended the Privacy Act to further prohibit disclosure of records contained in a system of records "to a recipient agency or non-Federal agency for use in a computer matching program except pursuant to a written agreement between the source agency and the recipient agency or non-Federal agency." 5 U.S.C. § 552a(o)(1).

84.     In the Computer Matching and Privacy Protection Act of 1988, Congress doubled down on its ban on any federal databases consolidating private data.

85.     Specifically, Congress provided that nothing in the Privacy Act "shall be construed to authorize (1) *the establishment or maintenance by any agency of a national data bank that combines, merges, or links information on individuals maintained in systems of records by other Federal agencies*; (2) the direct linking of computerized systems of records maintained by Federal agencies;" or "(3) the computer matching of records not otherwise authorized by law." Computer

20

Matching and Privacy Protection Act of 1988, Pub. L. No. 100-503, § 9, 102 Stat. 2507, 2514 (1988) (codified at 5 U.S.C. § 552a note) (emphasis added).

86.     To ensure that agencies do not rely on inaccurate data, the Privacy Act requires that "[e]ach agency that maintains a system of records," such as Defendants, "shall" "maintain all records which are used by the agency in making any determination about any individual with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the determination." 5 U.S.C. § 552a(e)(5).

87.     The Privacy Act further requires that "[e]ach agency that maintains a system of records," such as Defendants, "shall" "prior to disseminating any record about an individual to any person other than an agency . . . make reasonable efforts to assure that such records are accurate, complete, timely, and relevant for agency purposes." *Id.* § 552a(e)(6).

88.     The Privacy Act also mandates that "[e]ach agency that maintains a system of records," such as Defendants, "shall" adopt "appropriate . . . safeguards" "to [e]nsure the security and confidentiality of records and to protect against any anticipated threats or hazards to their security or integrity which could result in substantial harm, embarrassment, inconvenience, or unfairness to any individual on whom information is maintained[.]" *Id.* § 552a(e)(10).

## IV.     The Citizenship Lists Rely on Inaccurate and Woefully Incomplete Citizenship and Address Data

89.     The Order instructs that "[t]he State Citizenship List shall be derived from Federal citizenship and naturalization records, SSA records, SAVE data, and other relevant Federal databases."

90.     But no national citizenship or residency database exists in citizenship and naturalization records, SSA records, SAVE data, or any other relevant Federal database.

21

91.    And the records identified in the Order, specifically SSA records and SAVE data, are riddled with inaccurate and incomplete information.

92.    SSA records and the SAVE System were not created to be citizenship or residence databases. Rather, SSA records and the SAVE System contain and rely on inaccurate, stale, and woefully incomplete citizenship and address data.

93.    Subjecting voters to verification based on their presence on a necessarily incomplete list compiled from flawed data from SSA and the SAVE System will result in substantial harm and unfairness to voters.

> **i.    The SAVE System was not created to be a citizenship or residency database and has known accuracy problems**

94.    The original SAVE System was created in 1986 to allow government agencies to verify whether non-citizens are eligible for certain government benefits. *See* Pub. L. No. 99-603, title I, § 121(a)(1)(C), 100 Stat. 3359, 3384-86 (1986) (codified at 42 U.S.C. § 1320b-7(d)); *id.* § 121(c)(1), 100 Stat. at 3391 (codified at 42 U.S.C. § 1320b-7 note) ("The Commissioner of Immigration and Naturalization shall implement a system for the verification of immigration status under . . . [42 U.S.C. § 1320b-7(d)(3)], (4)(B)(i) of this section . . . so that the system is available to all the States by not later than October 1, 1987.").

95.    The original SAVE System was a limited and narrow system meant to fit its specific use of verifying whether non-citizens were eligible for benefits. SAVE could not run queries of U.S.-born citizens, because SAVE could only verify the "citizenship and immigration

status of an immigrant, nonimmigrant, and certain naturalized and derived U.S. citizens."[9] SAVE searches only accessed immigration-related records and did not rely on any Social Security data.[10]

96.     The original SAVE System had documented errors and lags in information on citizenship. The underlying USCIS information relied upon by the SAVE system is fragmented across multiple agency databases that have never been fully integrated.

97.     Naturalization records may appear in only one dataset, and certain files may exist only as paper records. Naturalized citizens interact with various government agencies at different stages of the immigration and naturalization processes, and there is no system for updating each agency's records. As a result, even DHS data specifically about immigration and citizenship status has sometimes been outdated, with some records showing that an individual is a non-citizen long after they have naturalized.

98.     In recent years, some states began using the SAVE System to attempt to verify the citizenship of people on their voter rolls for list maintenance purposes, but those states have repeatedly run into severe accuracy issues.

99.     For example, the North Carolina State Board of Elections determined in its audit of the 2016 election that, "based on past experience," a "match with the SAVE database is not a reliable indicator that a person is not a U.S. citizen because the database is not always updated in a timely manner and individuals who derived citizenship from their parents through naturalization or adoption may show up as non-citizens in SAVE."[11]

_____

[9] *Privacy Impact Assessment for the Systematic Alien Verification Entitlements Program, DHS Ref. No. DHS/USCIS/PIA-006(c)*, Dep't of Homeland Sec., 2-3 (June 30, 2020), https://perma.cc/HU2M-NTL8.
[10] *Id.* at 2.
[11] N.C. State Bd. of Elections, *Post Election Audit Report: General Election 2016*, (Apr. 21, 2017), https://perma.cc/WH8U-RZ4B.

100.    Federal courts similarly found that the citizenship data queried by the SAVE System was unreliable for voter eligibility checks. *See, e.g.*, *Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 261 (4th Cir. 2021) ("The Board determined that 97.6% of persons identified by the DMV as non-citizens, in fact were citizens, and that about 75% of individuals who later provided proof of citizenship continued to be listed as non-citizens in the SAVE system.").

### ii. The federal government rushed to develop a new SAVE System to purge non-citizen voters, despite existing safeguards against non-citizen voting

101.    In 2025, in response to the President's directives to DHS and SSA in the March 2025 Voting EO, DHS dramatically and rapidly overhauled SAVE in an attempt to transform it into a database to verify voters' citizenship status ("Overhauled SAVE System"). This represents a significant, and unlawful, departure from the traditional purpose of SAVE. *See* Am. Compl., *League of Women Voters v. Dep't of Homeland Sec.*, No. 1:25-cv-03501-SLS (D.D.C. Jan. 21, 2026), ECF No. 61.

102.    The March 2025 Voting EO mandated that the overhaul of the SAVE System take place within just 30 days. To comply with this timeline, federal officials moved hastily, testing the Overhauled SAVE System themselves, and deploying it within two weeks of starting the project.[12]

103.    The Overhauled SAVE System expanded SAVE to allow user agencies to "input Social Security numbers" to "help verify U.S. citizenship"—including of U.S.-born citizens—based on a "new partnership with the Social Security Administration" and DHS.[13]

---

[12] Jen Fifield & Zach Despart, *"Not Ready for Prime Time." A Federal Tool to Check Voter Citizenship Keeps Making Mistakes*, ProPublica (Feb. 13, 2026), https://perma.cc/LG9X-YRYH.
[13] USCIS Newsroom, *USCIS Deploys Common Sense Tools to Verify Voters*, USCIS (May 22, 2025), https://perma.cc/HBZ5-RW2E.

104.    DHS initially failed to issue a systems of record notice ("SORN") related to the SAVE overhaul, and then belatedly issued one on October 31, 2025 ("SAVE SORN").[14] The SAVE SORN only allowed for comments until December 1, 2025, but also made clear that the changes would take effect on December 1, regardless of the comments.[15]

105.    The 2025 SAVE SORN purports to establish two new "routine uses" for its data system.

106.    First, the SORN purports to establish "Routine Use L" to enable DHS to disclose records to SSA "and other federal, state, tribal, territorial, local, governments and other authorized entities to assist [SAVE] user agencies [to] determine U.S. citizenship and immigration status of an individual when a DHS approved agreement is in place between DHS and the entity."[16]

107.    Second, the SORN establishes "Routine Use M" to enable DHS to disclose records to "federal, state, territorial, tribal, local, and other entities that have legal authority to provide oversight to programs and benefits supported by SAVE for auditing of program requirements and when a DHS-approved agreement (e.g., Memorandum of Agreement (MOA) or Computer Matching Agreement (CMA)) is in place between DHS and the entity."[17]

108.    Similarly, NUMIDENT, the agency within SSA that collects citizenship information, issued a new SORN in November 2025 that added a new routine use permitting disclosures of "citizenship and immigration information to the Department of Homeland Security, pursuant to 8 U.S.C. 1373(a)."[18]

---

[14] Privacy Act of 1974; System of Records, 90 Fed. Reg. 48948-01, 48949-50 (Oct. 31, 2025).
[15] *Id.* at 48949.
[16] *Id.* at 48954.
[17] *Id.*
[18] Privacy Act of 1974; System of Records, 90 Fed. Reg. 50879-03, 50880, 50883 (Nov. 12, 2025).

109.     This Court has already recognized that the Administration unlawfully ran roughshod over the Privacy Act in the creation of the Overhauled SAVE System: "It is flatly inconsistent with the text, structure, and purpose of the Privacy Act for an agency to initiate a major new data-sharing program affecting the sensitive data of millions of Americans, then validate that program as a 'routine use' months after it has begun." *LULAC II*, 2026 WL 252420, at *55.

110.     According to USCIS, the Overhauled SAVE System first attempts to match a voter's information against the SSA's citizenship data based on social security number. If this data does not confirm that a voter is a citizen, SAVE then searches additional DHS databases.

111.     But this data matching is prone to errors, not only because it relies on multiple unreliable data sources, but also because the DHS and SSA data sources do not have the same identifiers for searching their records, meaning that a social security number cannot be used to search the DHS databases queried by SAVE, and a DHS-issued numeric identifier cannot be used to search SSA records.[19] As a result, "information about foreign-born U.S. citizens contained in USCIS naturalization databases may not be locatable when SSA is unable to confirm" U.S. citizenship.[20]

112.     In October 2025, DHS acknowledged that there is a risk that SAVE "may share inaccurate information with registered agencies, which could in turn impact a registered user agency's eligibility determination for an individual."[21] And that the SAVE System data only

---

[19] Off. of the Gen. Counsel, *Letter from SSA to Fair Elections Ctr.*, at 2 (July 13, 2023), https://perma.cc/KS2N-U2US. ("Letter from SSA to Fair Elections Ctr.")
[20] Westat Report to DHS, *Evaluation of the Accuracy of E-Verify Findings*, at xii (July 2012), https://perma.cc/54EN-82KN.
[21] Dep't of Homeland Sec., *Privacy Impact Assessment for the Systematic Alien Verification Entitlements Program*, DHS Ref. No. DHS/USCIS/PIA-006(d), at 19 (Oct. 31, 2025), https://perma.cc/G92ULYPM.

"partially mitigates this risk," and "due to misspelling of names, transposed numbers, or incomplete information, the SAVE Program may produce inaccurate results."[22]

113.    Brian Broderick, who leads the verification division of USCIS, has acknowledged that the system cannot consistently find the most current citizenship information for people not born in the U.S.[23]

114.    SAVE's inability to accurately verify the citizenship of non-U.S. born citizens is well-understood by DHS officials. Indeed, in offering access to the SAVE System to States, USCIS has disclaimed any responsibility for a state's reliance on that data to remove voters from the rolls. According to Broderick, "if we can verify citizenship, great," but "[i]f we can't, now it's up to you to determine whether to let this person on your voter rolls."[24]

115.    Nothing in the original SAVE System or Overhauled SAVE System purports to identify an individual's current residence or to verify an individual's residence for voting purposes. Because the SAVE System is a point-in-time system for which the underlying data is not regularly updated, any address information maintained in the SAVE System would not be updated to reflect changes in address.

### iii.    SSA has unreliable and incomplete citizenship data

116.    SSA's citizenship data is unreliable, particularly for naturalized citizens, because SSA captures citizenship data from an individual from a snapshot in time when they apply for a Social Security Number ("SSN"), which typically occurs before an individual naturalizes. If that

---

[22] *Id.*
[23] *Id.*
[24] Jen Fifield & Zach Despart, *"Not Ready for Prime Time." A Federal Tool to Check Voter Citizenship Keeps Making Mistakes*, ProPublica (Feb. 13, 2026), https://perma.cc/LG9X-YRYH.

27

snapshot changes after the individual applies for a SSN, and the person becomes a U.S. citizen by naturalization after they receive the SSN, the SSA does not automatically update their citizenship.[25]

117.    SSA's unreliable citizenship data is also likely to impact derived citizens, who are born outside of the United States and derive citizenship as children by operation of law when their parents naturalize because these individuals would have no reason to interact with SSA until they are ready to apply for Social Security benefits.

118.    SSA admitted in 2023 that because "the citizenship [data] SSA maintains merely represents a snapshot of the individual's citizenship status at the time of their interaction with SSA," its "records do not provide definitive information about an individual's citizenship status," and thus has cautioned against relying on SSA data to verify citizenship or immigration status. As SSA has explained, "SSA is not the agency responsible for making citizenship determinations" and "SSA is not the custodian of U.S. citizenship records."[26]

119.    A 2006 audit by SSA's Inspector General estimated that SSA's citizenship data inaccurately identified approximately 3.3 million U.S. citizens as non-citizens "because [they] had become U.S. citizens after obtaining their SSN" and "had not updated their records with SSA."[27]

120.    SSA also lacks complete citizenship data for citizens born in the United States prior to 1981, which is the year that SSA began consistently collecting citizenship information.[28] According to SSA, "SSA's assessment of its citizenship data indicates that approximately 1/4 of those records do not have an indication of citizenship present."[29] That means SSA likely does not

---

[25] Letter from SSA to Fair Elections Ctr.
[26] Letter from SSA to Fair Elections Ctr., at 2.
[27] SSA Off. of the Inspector Gen., Cong. Response Rep. No. A-08-06-26100, Accuracy of the Social Security Administration's Numident File, at iii (Dec. 18, 2006), https://perma.cc/6JNM-W7WL.
[28] Letter from SSA to Fair Elections Ctr., at 2.
[29] Id. at 3.

have information about citizenship status for U.S.-born citizens older than their mid-forties unless they have subsequently filed for Social Security benefits or sought a new Social Security card.

### iv.   SSA has unreliable residency information

121.   SSA lacks accurate information for voters' addresses and certainly does not have data intended to match an individual's residence for purposes of voting.

122.   SSA maintains address information only for individuals who are receiving social security benefits, because SSA is not a residency registry for the general population.

123.   Any address information that SSA collects is not collected for the purpose of establishing residence for voting, which can be distinct from one's mailing address or temporary residence.

124.   Even for those who are receiving social security benefits, a relatively small subset of the eligible voting population, SSA does not have accurate address or residency information. SSA regulations place the entire burden on the beneficiary to report address changes. *See* 20 C.F.R. § 416.708(a) ("You must report to us any change in your mailing address and any change in the address where you live."); *Update contact information*, Social Security Administration, https://www.ssa.gov/personal-record/update-contact-information (last visited Apr. 1, 2026).

125.   As a result, voters who have not updated their mailing address with SSA are at acute risk of SSA maintaining inaccurate address information. This is particularly true for more transient populations, including students and young adults, renters, military families, and low-income people. This is also particularly true for people with poor internet access who cannot easily update their address information with SSA.

### v. The SAVE System has already proven unreliable for verifying citizenship for purposes of voting

126.    States' use of the Overhauled SAVE System has forced eligible U.S. citizen voters to needlessly provide documentary proof of citizenship to state and federal authorities, caused lawful voters to be wrongfully removed from voter rolls, created significant confusion and problems for election administrators, and jeopardized millions of Americans' privacy and data security.

127.    States' use of the overhauled SAVE System has proven to be remarkably faulty.

128.    Shortly after the new System was deployed and put into use by multiple states, DHS had to correct information provided to at least five states after SAVE misidentified many voters as noncitizens. At least one state, Missouri, had already started its investigation into the results they received from SAVE when DHS officials informed them of the corrected information that adjusts SAVE's responses for many individuals from non-U.S. citizen to U.S.[30]

129.    In Texas, there have been many instances of SAVE identifying eligible U.S. citizens as non-citizens, leading to their threatened or actual removal from the rolls. Indeed, in some Texas counties the error rate has been staggering, with more than half of the voters that SAVE identified as non-citizens providing documentary proof of citizenship in some counties.[31]

130.    As a result of SAVE's errors, numerous election administrators have expressed their frustration and mistrust in the system. Seventy Missouri county clerks expressed this sentiment in a letter to Missouri state legislative leadership, saying that voters SAVE identified as non-citizens "regularly included 'individuals we know to be U.S. citizens—our neighbors,

---

[30] Jen Fifield & Zach Despart, *"Not Ready for Prime Time." A Federal Tool to Check Voter Citizenship Keeps Making Mistakes*, ProPublica (Feb. 13, 2026), https://perma.cc/LG9X-YRYH.
[31] Jen Fifield & Zach Despart, *A federal tool to check voter citizenship keeps making mistakes. It led to confusion in Texas*, The Texas Trib. (Feb. 13, 2026), https://perma.cc/XKE2-YMNQ.

colleagues and even voters we have personally registered at naturalization ceremonies.'"[32] A South Carolina election official similarly expressed to federal officials that the information obtained from SAVE has "'raised more questions than it [has] answered.'"[33] And in Texas, many county election officials have denounced SAVE. Election officials referred to the process of verifying voter registrations of voters flagged as non-citizens by SAVE registrations as "'confirmation that SAVE is not a reliable resource.'"[34] SAVE, according to Texas election officials "has proven to be inaccurate.[35]

## V.      The Order Asserts Sweeping Presidential Power Over the Operation of the United States Postal Service

131.    Federal law limits USPS's role in federal elections to ensuring the timely delivery of election mail, including mail and absentee ballots. Neither federal law nor the Constitution provide a role for the President in the operation of USPS's delivery of election mail.

132.    Specifically, the Postal Reorganization Act of 1970 (PRA) enumerates USPS's responsibilities, which include "the collection, handling, transportation, delivery, forwarding, returning, and holding of mail," and expressly prohibits "any nonpostal service, except that the Postal Service may provide nonpostal services which were offered as of January 1, 2006." 39 U.S.C.A. § 404(a)(1), (e)(2). Federal law defines "nonpostal services" as anything other than the delivery of letters, printed matter, or mailable packages, including acceptance, collection, sorting, transportation, or other functions ancillary thereto. 39 U.S.C.A. §§ 404(e), 102(5).

---

[32] Alexandra Berzon & Nick Corasaniti, *Initial Review Finds No Widespread Illegal Voting by Migrants, Puncturing a Trump Claim*, N.Y. Times (Jan. 14, 2026), https://www.nytimes.com/2026/01/14/us/politics/noncitizen-voters-save-tool.html.
[33] *Id.*
[34] Natalia Contreras, *Some registered voters Texas flagged as "potential noncitizens" had already shown DPS proof of citizenship*, The Texas Trib. (Dec. 18, 2025), https://perma.cc/JBW3-NSVD.
[35] Jen Fifield & Zach Despart, *A federal tool to check voter citizenship keeps making mistakes. It led to confusion in Texas*, The Texas Trib. (Feb. 13, 2026), https://perma.cc/XKE2-YMNQ.

133. The most fundamental duty of USPS is universal service. The opening words of the PRA provide that USPS "shall be operated as a basic and fundamental service provided to the people by the Government . . . authorized by the Constitution, created by Act of Congress, and supported by the people." 39 U.S.C. § 101. This obligation is intended "to bind the Nation together through the personal, educational, literary, and business correspondence of the people." *Id.* The USPS must "provide prompt, reliable, and efficient services to patrons *in all areas* and shall render postal services to *all communities*." *Id.* (emphasis added).

134. USPS does not maintain a database of residential customers.[36]

135. USPS defines election mail to include "any item mailed to or from authorized election officials that enables citizens to participate in the voting process—including ballots, sample ballots, voter registration cards, absentee voting applications and polling place notifications."[37] *See also* 39 C.F.R. § 3055.100(b). USPS considers mail and absentee ballots a type of election mail known as ballot mail.

136. Additionally, USPS is charged with collecting absentee ballots and providing expedited delivery of absentee ballots on behalf of military and overseas voters under UOCAVA. *See* 52 U.S.C. § 20304(b).

137. USPS's role does not include verifying whether the addressee of an absentee or mail ballot is eligible to receive that ballot. USPS is also not charged with the creation of lists of voters for the purposes of collecting and delivering election mail.

---

[36] *Get an Address List*, U.S. Postal Serv. Postal Explorer, https://perma.cc/4XWB-6P2X (last visited Apr. 1, 2026).
[37] *Election Mail*, U.S. Postal Serv., https://perma.cc/S2P7-RWR7 (last visited Apr. 1, 2026).

138.    USPS's job, put simply, is to collect and deliver the mail to whom it is addressed. No federal law sets forth, or permits, an independent verification requirement for USPS in processing ballot mail.

139.    While straightforward, USPS's role is vitally important to the nation's election infrastructure and essential to American democracy. USPS facilitates the exchange of information between voters and election officials, including millions of mail ballots, prioritizing these mail pieces to ensure their delivery in a predictable, speedy time. In 2024 alone, USPS processed more than 200 million pieces of ballot mail.[38]

140.    USPS cannot make significant changes without undergoing certain deliberative procedures. Specifically, "[w]hen the Postal Service determines that there should be a change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis, it shall submit a proposal, within a reasonable time prior to the effective date of such proposal, to the Postal Regulatory Commission requesting an advisory opinion on the change." 39 U.S.C. § 3661(b). The Postal Regulatory Commission (PRC) may not issue an opinion on any such proposal until it has held a public hearing that accords with §§ 556 and 557 of the APA. *Id.* § 3661(c).

141.    USPS is also subject to federal regulations which prescribe the method and manner of processing mail.

142.    Due to the massive growth of mail and absentee voting since the 2020 pandemic, USPS has taken many additional affirmative steps in election years to ensure timely delivery of ballots and other election mail.

---

[38] U.S. Postal Serv., *2024 Post-Election Analysis Report: Delivering the Nation's Election Mail Securely and Effectively* (Dec. 2, 2024), https://perma.cc/6JC7-F34Z.

143.    This includes creating guidance documents outlining USPS's efforts to deliver all mail ballots in a timely manner, as required by regulations approved by the Postal Regulatory Commission and a 2021 settlement agreement. *See* Stipulation of Settlement and Proposed Order, *NAACP v. USPS*, No. 1:20-cv-02295-EGS (D.D.C. Dec. 17, 2021), ECF No. 170.

144.    This also includes implementing "extraordinary measures" through at least 2028, using priority mail and local delivery, among other measures, to ensure the timely delivery of all absentee and mail ballots. *Id.*

145.    Whether an individual receives mail at an address does not establish whether an individual is a resident at that address for the purposes of voting.

146.    There are many reasons why an individual may address mail to an address other than their voting residence, including election mail. For example, while individuals may change their residential address when they move with the USPS's National Change of Address ("NCOA") database, individuals are not required to do so. Many individuals receive mail at their prior residence simply because they did not provide USPS with their new address.

147.    Conversely, NCOA data does not necessarily reflect that an individual has changed their voting residence. NCOA data often includes eligible military and overseas voters whose addresses appear to have changed but have not changed for the purposes of their voter registration. Students may also have their mail forwarded to their college address but still permanently reside at their home away from college.

148.    For this reason, states undergo a rigorous list maintenance process as provided by state law and the National Voter Registration Act to ensure that voters are still residents of their respective state.

149.    Additionally, while USPS currently provides an election mail logo for states to include on their ballot mail, this logo is an optional feature. This logo serves merely as a method for sorting election mail and does not alone establish that the mail has an absentee or mail ballot contained therein.

150.    Many voters send absentee ballots to addresses where they do not reside.

151.    Upon information and belief, USPS has no independent systematic means of verifying whether an individual actually resides at the address known to USPS and it certainly is not equipped or authorized to assess whether that individual is a resident of that state for purposes of voting.

152.    The President's authority over USPS is also limited by the Constitution, which provides Congress the authority "[t]o establish Post Offices and post Roads" and "[t]o make all Laws which shall be necessary and proper" for executing this task. U.S. Const. art. I, § 8 ("Postal Clause"); *U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 121 (1981). Under the Postal Reorganization Act of 1970, Congress used its authority under the Postal Clause to establish USPS.

153.    Neither the Constitution nor federal law provide the President with the authority to enlarge USPS's role in federal elections. The EO, however, purports to create responsibilities and duties for USPS not otherwise provided by federal law.

154.    Under the EO, the President has granted himself the authority to "protect the integrity of the mail as a medium for transmitting Federal election ballots and establish uniform standards for mail-in or absentee ballot services implemented through the United States Postal Service." Order § 3(b).

35

155. The EO defines these "services" to include the establishment by USPS of "a State-specific list" of individuals "who are enrolled with the USPS [] for mail-in or absentee ballots provided by such State," known as the Mail-In and Absentee Participation List. *Id.*

156. The EO does not provide how an individual may be "enrolled with the USPS" for "mail-in or absentee ballots." No federal law prescribes a method by which an individual may enroll with USPS—or USPS may "enroll" an individual—for the purposes of receiving ballot mail.

157. The EO also defines USPS's "services" to include refusing to deliver mail or absentee ballots to individuals who are not present on the Mail-In and Absentee Participation List. Order § 3(b)(ii)-(iii).

158. No federal regulation or statute authorizes USPS to refuse to deliver any mail under these circumstances. Indeed, federal statutes set forth the *exclusive* circumstances when USPS is authorized to withhold mail: mail that is "nonmailable"[39]; mail addressed to a fictitious addressee only "[u]pon evidence satisfactory to the Postal Service," 39 U.S.C.A. § 3003; mail addressed to an individual who does not reside or work at the designated address, but only if the purpose is "to enable the person to escape identification," 39 U.S.C.A. § 3004; hazardous material, 39 U.S.C.A. § 3018; and other mail at the discretion of the addressee. *See generally*, 39 U.S.C.A. §§ 3001-3018.

159. The EO does not provide how USPS would determine whether an absentee ballot recipient is present on the Mail-In and Absentee Participation List. But regardless of that process, USPS does not have authority to create such a list of eligible absentee or mail voters or to restrict delivery of absentee or mail ballots based on such a list.

---

[39] Nonmailable matter includes matter which "exceeds the size and weight limits prescribed for the particular class of mail; or is of a character perishable within the period required for transportation and delivery." 39 U.S.C.A. § 3001(c)(1).

160.    As USPS has acknowledged, their role plainly does not include "[f]ederal, state, or local election laws or practices, or the extent to which they incorporate the mail."[40]

## VI.    The Order Harms Plaintiffs

### i.    LULAC

#### a.    Harms to LULAC's Members

161.    LULAC's members will be harmed by Sections 2(a), 3(b)(iii), and 3(b)(iv) of the Order.

162.    LULAC has many members who are non-U.S.-born citizens, including members who have become citizens through naturalization. The creation and possible use of the "State Citizenship List" under Section 2(a) to determine eligibility to vote increases the risk that non-U.S.-born or naturalized citizens will be kicked off of the rolls, creating new hurdles to the ballot for these voters.

163.    Combining multiple federal databases foreseeably results in more errors for individuals who have become naturalized. These naturalized citizens have multiple numbers at different stages of their immigration process—alien registration numbers, visa numbers, naturalization numbers, citizenship certificate numbers, and others. Often these numbers are not updated across databases, so a person who has naturalized may be flagged as a non-citizen if one of the databases has an outdated number. And the mere existence of the alien registration number—even if the number is no longer in use—makes it more likely that naturalized citizens will not be included on the State Citizenship List.

164.    Many of LULAC's naturalized citizen members have multiple Spanish surnames, as is the custom in many Hispanic families, meaning they often have variations of their names on

---

[40] 2024 Post-Election Analysis Report, U.S. Postal Serv., at 4 (Dec. 2, 2024), https://perma.cc/6JC7-F34Z.

different documents. As a result, these members may be listed under different names on different lists. Errors can occur as databases are merged, causing legitimate citizens to be left off the State Citizenship List and mismatches to occur between state and federal records.

165. Because the State Citizenship List relies on citizenship and naturalization records spread across various federal agencies and on some unknown number of "relevant Federal databases," there is significant risk of outdated data, mismatched data, and other errors. It is a near certainty that some of LULAC's naturalized citizen members will be identified as non-citizens based on such outdated or incorrect data.

166. States that use the State Citizenship List to purge their voter rolls will remove citizens from their rolls who have erroneously been left off the State Citizenship List, leaving these voters to scramble to re-register to vote in the days before the election. And because the State Citizenship List must be transmitted to state election officials just 60 days before a federal election, some voters will be left with little time to re-register or no time to re-register at all.

167. The harm wrought by precisely this sort of inaccurate federal database is not theoretical. In Texas, for example, use of the federal SAVE database has incorrectly identified eligible U.S. citizen voters as non-citizens. Some of them have been incorrectly removed from the voter rolls as a result.

168. For those LULAC members who are wrongfully purged after not being included on the State Citizenship List, many are already fearful of interacting with the government in any way. For these individuals, Section 2(a)'s procedures to allow individuals to "access their individual records and update or correct them in advance of elections" provide little solace. Many voters, including LULAC members, will not update or correct records, and thus will not vote, to avoid additional interaction with government officials.

38

169. Sections 3(b)(iii) and 3(b)(iv) also cause harm to LULAC's members who vote by mail by creating confusion and new barriers to the absentee ballot process. LULAC has thousands of members who routinely request and cast absentee ballots where state laws allow. These members vote absentee for many different reasons, including because they are disabled, elderly, deployed domestically or abroad, medically incapacitated, lacking reliable transportation, or otherwise.

170. These members are now unsure whether their names will be on the "State Mail Voter List" under Section 3(b)(ii) or the "Mail-in and Absentee Participation List" under Section 3(b)(iii), and the late date these lists must be produced increases the risk of ineffective remedies if voters are erroneously excluded. LULAC's absentee-voting members will be harmed if they are not properly listed because they will be prevented from receiving and sending their absentee ballot through the Postal Service.

171. Because many LULAC members rely on vote by mail out of necessity, they risk not being able to vote at all if they cannot vote by mail.

172. Finally, LULAC members' privacy is also harmed by the creation of the State Citizenship List, the State Mail Voter List, and the Mail-in and Absentee Participation List and the distribution of this data among federal agencies and between federal and state officials. LULAC's members fear what will come of the aggregation, disclosure, and potential misuse of their sensitive personal information. The State Citizenship List, on its own, could include an individual's residence, citizenship information, social security number, employment authorization history, and identifying numbers, among other potential types of data. For those members who are newly naturalized, live in mixed-status houses, or otherwise fear immigration enforcement actions, the

39

widespread sharing of their personal information between and amongst federal agencies and state officials intrudes on their sense of security.

### b. Harms to LULAC as an Organization

173.   The Order will impede LULAC's work to register voters and get out the vote through in-person voting and mail voting. LULAC's councils are trusted community organizations, and prospective voters routinely seek out the LULAC's help to register to vote, to apply to receive an absentee ballot, and to update their voter information.

174.   In the past, LULAC has been able to reassure registrants that the information collected to assist in registering them to vote, applying for an absentee ballot, or updating their voter registration forms is safe and secure. But LULAC can no longer provide the same reassurance to community members. Instead, the organization is now fielding questions and concerns from community members about how their information will be used if they register to vote or if they request an absentee ballot. The Executive Order's mandated collection and distribution of voters' information—through the State Citizenship List, the State Mail Voter List, and the Mail-in and Absentee Participation List—frustrates LULAC's mission to register and encourage voting because the community LULAC serves is increasingly hesitant to interact with federal and state officials in any capacity, including by voting. Over the coming days, weeks, and months, LULAC will be forced to divert resources to educating voters about these new processes, assisting them if they are improperly excluded from federal lists, and attempting to assuage their fears. But the effect will be that fewer LULAC members and community members will register to vote and vote.

175.   The Executive Order's provisions on mail voting have also created and will continue to create chaos and confusion among LULAC's members and throughout the Latino community LULAC serves. As a result, LULAC will devote substantial time and resources to

40

determining how best to ensure its members and community members are able to access vote by mail, including by ensuring that these individuals are listed on all relevant lists so that they can receive a mail ballot to begin with. For those who are excluded from the relevant lists, LULAC will need to, and intends to, divert resources to set up programming to assist voters with the complicated process of voting by mail under the Executive Order. Even still, some members will fall through the cracks of the byzantine system of mail voting created by the Order.

176. Because the Executive Order's mail voting provisions will also implicate the timing of mail voting, LULAC also intends to divert resources to educate and assist members and community members about timely receiving and returning their mail ballot.

177. To meet the resource needs and staffing required to educate and assist members navigating the implementation of the Executive Order, LULAC will have to divert significant resources from its other important initiatives. LULAC is currently devoting significant resources and staff time toward combatting aggressive immigration enforcement, fighting the dismantling of Diversity, Equity, and Inclusion initiatives, and providing economic empowerment programs to its members. These programs stand to suffer if LULAC must use its limited resources to combat the effects flowing from the implementation of the Order.

### ii. SFI

#### a. Harms to SFI's Members

178. SFI's members will be harmed by Sections 2(a), 3(b)(iii), and 3(b)(iv) of the Order, which require the creation of lists containing information about Americans and orders USPS to not deliver ballots to those who are not on the specified list.

179. There are over 4 million U.S. citizens living overseas, many of whom vote using the procedures required by UOCAVA.[41] UOCAVA voters are U.S. citizens who are active members of the Uniformed Services, the Merchant Marines, the commissioned corps of the Public Health Service and the National Oceanic and Atmospheric Administration, diplomats and Foreign Service Officers, their eligible family members, and many other U.S. citizens residing outside the United States. When deliberating over the merits of UOCAVA, Congress found that one reason why military and overseas citizens faced difficulties voting was because states had enacted legal and administrative obstacles that "discourage[d] or confuse[d] overseas citizens." H.R. Rep. No. 99-765, at 9 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 2009, 2013.

180. SFI has members who request and cast a mail ballot using State-provided mechanisms for absentee voting, as well as members who register to vote and request an absentee ballot using the Federal Post Card Application (FPCA) created pursuant to UOCAVA.

181. These members are harmed by the Executive Order because they will not be able to vote by mail—and thus will not be able to vote at all—if they are not included on one or more of the lists established by the Order.

182. It is a near certainty that these lists will not contain accurate information about some SFI members—if those members are included on the lists at all—in numerous respects, including with respect to address and physical residency information.

183. SFI members move frequently because of their status as military dependents. This includes frequent moves that often occur as part of the permanent change of station process during

---

[41] The Federal Voter Assistance Program estimates there are 4.4 million U.S. citizens living overseas while the State Department estimates there are over 9 million U.S. citizens living overseas. *Compare* 2022 Federal Voting Assistance Program Report to Congress, Federal Voting Assistance Program (Aug. 3, 2023), https://perma.cc/QZC2-LX2E, *with* Consular Affairs by the Numbers, U.S. Dep't of State Bureau of Consular Affs. (Jan. 2020), https://perma.cc/VT5Z-524T.

the summer months, which takes place in the weeks leading up to and during federal primary and general elections. SFI members relocate frequently, and often multiple times, during the permanent change of station season.

184. SFI members who relocate to accommodate the assignments of their family members, including those who move pursuant to a permanent change of station process, often change their physical residence, and may also choose to update their legal residence for voting purposes if permitted, within 60 days of an election. It is a near certainty that these members would not have their address appropriately reflected on the State Citizenship List or appropriately enrolled on the Mail-In and Absentee Participation List, and as such would be unable to vote with a mail ballot and be disenfranchised.

185. Because of the nature of military service, most SFI members do not maintain a physical address or residence in the state in which they maintain their legal residence for voting purposes. They receive their mail at the location where they physically reside, which is often not their legal residence for the purpose of exercising their right to vote. Again, it is a near certainty that these members would not have their address appropriately reflected on the State Citizenship List or appropriately enrolled on the Mail-In and Absentee Participation List, and as such would be unable to vote with a mail ballot and be disenfranchised.

186. Moreover, even assuming that SFI members are not in the process of relocating in the lead-up to an election, the requirement that voters be "enrolled" with USPS in order to have their absentee ballot transmitted places is an additional burden on the vote-by-mail process that harms SFI members. And this requirement all but ensures that SFI members who do relocate near-in-time to an election will not be appropriately "enrolled" in the Mail-In and Absentee Participation List and thus entirely disenfranchised.

43

187.    SFI members are also harmed by the Order's provisions which would prevent mail (in this case, absentee ballots) that members are entitled to receive from being sent to them, and from members having their marked absentee ballots returned through the Postal Service.

188.    In addition to state-created mechanisms for absentee voting and the FPCA, SFI members have used and will use the Federal Write-in Absentee Ballot created by UOCAVA. The Federal Write-in Absentee Ballot allows UOCAVA voters absent from the United States to complete and print a back-up ballot for federal races if they do not receive their absentee ballot. The Executive Order makes no accommodation for voting absentee by this mechanism and would likely disenfranchise voters who are eligible to vote under UOCAVA from having their Federal Write-in Absentee Ballot transmitted or counted.

189.    The Order's provisions requiring list creation and sharing of personal information between entities also harm SFI members who have a particular interest in maintaining the security of their personal information due to the commitment of their family members to service. SFI members stationed abroad are a heightened target for foreign adversaries and have often been trained on security risks. Many SFI members have experienced direct threats to their personal security and take measures to protect even basic personal information from disclosure.

190.    SFI members are also harmed by the uncertainty and confusion surrounding their ability to vote by absentee ballots as a result of the Order. SFI members are likely to move frequently and are already required to begin planning to register to vote and request a ballot earlier than others in the civilian population. The uncertainty as to what will be required of them under the Order, whether they will appropriately appear on the various lists contemplated by the Order, whether their information on those lists will be accurate, and if and how they may enroll in an additional absentee voting list, causes imminent harm to SFI members.

44

**b. Harms to SFI as an Organization**

191.    Because voting remains less accessible for its members and the broader military and overseas community, SFI educates, registers, and engages in non-partisan "get-out-the-vote" efforts for military voters in all elections. SFI engages in get-out-the-vote efforts every year, not only years in which there are significant federal elections. SFI routinely creates and distributes resources to assist its members and the broader military and overseas community. For example, SFI publishes material explaining to its voters how to vote by mail, how to find their voting assistance officer, and how to navigate state-specific election laws.

192.    Through its "Voting Ambassador Program," SFI trains military family members to become volunteer educators. These ambassadors are trained to register voters within their personal networks and educate others on how to navigate the specific challenges military families face, such as voting absentee and overseas due to frequent relocations. Voting Ambassadors promote civic participation among their military networks, including by hosting voter registration events targeting military-connected voters in their communities. Among other strategies, SFI promotes the FPCA among its members through its Voting Ambassador Program.

193.    As a result of the Order, SFI will need to divert staff time and resources toward overhauling its member services programming. SFI will have to add an entire section to its Voting Ambassador Program for members on how to help military families in their networks ensure they are able to vote by mail, and conduct additional training and outreach events, consuming staff time and resources that would not otherwise have been required. These education and outreach events include events and trainings on virtual platforms, as well as written materials distributed through email, social media, and other means.

194.    To respond to the Order and work to ensure that its members are able to vote by mail, SFI will need to divert staff time and resources to helping members ensure they are enrolled appropriately on various lists when requesting absentee ballots, including when using the FPCA or Federal Write-in Absentee Ballot.

195.    Because of the Order, SFI also plans to conduct outreach events earlier in the year. Prior to the issuance of the Order, SFI planned its educational events leading up to the 45-day mark, when UOCAVA requires election officials to send UOCAVA voters their blank ballots. Now that the Order adds new milestones at 60 and 90 days before a federal election, SFI will need to revisit its entire event schedule to ensure that its members are as prepared as possible to comply with any new requirements contemplated by the Order.

196.    This expanded and early member education detracts from the activities that SFI had planned to do over the next several months and beyond. SFI staff is already being forced to divert time away from event planning for a major in-person member convening in order to create an explainer video to its members regarding the Order. Additionally, staff time that would have been devoted to having one-on-one meetings with new SFI volunteers is now going into education, outreach, and response to the Order.

197.    Unless and until Sections 2(a), 3(b)(iii), and 3(b)(iv) of the Order are declared void, SFI will need to continue to divert resources from its existing projects to educate and directly assist its members who have difficulty casting an absentee ballot in compliance with provisions of the Order. This will continue to divert resources from projects SFI is conducting and planned to conduct, including in-person event planning, volunteer meetings, and educational outreach to state legislators.

198.    Even with the extra resources and effort SFI will devote to helping its members register due to the Order, its mission will nevertheless be frustrated, because fewer SFI members and fewer military family members overall will be able to vote and to have their vote counted.

### iii. Arizona Students' Association
#### a. Harms to ASA's Members

199.    The Order is harming and will further harm ASA's members because it erects barriers to voting by mail and creates uncertainty and confusion about whether mail ballots will be received by voters and whether they will be able to return them to election authorities via USPS.

200.    Approximately half of ASA members at Arizona's universities are from out of state. Many out-of-state students who register to vote in Arizona may be incorrectly listed as residing in their home state instead of in Arizona and thus will be included on the wrong State Citizenship List, preventing them from receiving and returning their mail ballots.

201.    Some out-of-state students choose to remain registered in their home state and receive an absentee ballot at their temporary residence in Arizona. The delays and barriers to properly receiving mail created by the EO will have a significant impact on these members who are only able to vote if they receive their ballot via the mail from their home state in a timely manner.

202.    All of these ASA members who vote by mail—whether they are from Arizona or out of state—will be harmed by Sections 2(a), 3(b)(iii), and 3(b)(iv) of the Order, which require the creation of lists containing information about Americans and orders USPS not to deliver ballots to those who are not on the specified list.

203.    It is a near certainty that these lists will not contain accurate information about some ASA members—if those members are included on the lists at all—in numerous respects, including with respect to address and physical residency information.

204.   As college and university students, ASA members move frequently, meaning their address and residency information can quickly become outdated. This is particularly significant for out-of-state students who may have recently been residents of their home state but then relocated to and registered to vote in Arizona. These students are likely to show up on the State Citizenship List in their home state instead of in Arizona, where they are properly registered to vote, causing confusion, delay, and possible disenfranchisement.

205.   Because of constraints of classes, jobs, and transportation, many ASA members choose to vote by mail as they are unable to take the time to vote in person on election day. Many colleges and universities do not have a ballot dropbox on campus, meaning that returning their ballots via the mail is often the only practical option for students.

206.   ASA members are harmed by the Order's provisions that would prevent mail (in this case, absentee ballots) that members are entitled to receive from being sent to them, and from members having their marked absentee ballots returned via USPS.

207.   The Order's provisions requiring list creation and sharing of personal information between entities also harm ASA members who have a particular interest in maintaining the security of their personal information. ASA members from mixed immigration status families, members concerned about maintaining federal financial aid, and members living on their own for the first time are among those with particular concerns about protecting their personal information. These members will be discouraged or dissuaded from voting as a result of the Order's data sharing provisions.

208.   ASA members are also harmed by the uncertainty and confusion surrounding their ability to vote by absentee ballots as a result of the Order. ASA members are already navigating re-registering to vote, often in a new state, and the uncertainty about what lists they must appear

48

on, whether and how to correct or update the lists if necessary, and the uncertainty of whether they will be able to receive and return their mail ballots creates imminent tangible harm to ASA members.

### b. Harms to ASA as an Organization

209.    ASA is and will be acutely harmed by the EO. ASA engages in voter registration activities, and follow-up and assistance to ensure students have properly registered and were able to vote—including by mail if that is how they are registered. ASA also engages in voter education and get-out-the-vote efforts that include information about how to vote by mail. The additional barriers, lists, and opportunities for inaccuracies will directly impact ASA's ability to effectively conduct these activities.

210.    When registering voters, ASA specifically encourages students to sign up to receive a mail ballot. This allows students time with their ballot to research candidates, attend ASA information sessions about candidates and issues, and to cast an informed vote. The provisions of the Order that make mail voting more difficult or impossible for students will result in fewer students registered to vote by mail, and less opportunity for these important ASA activities.

211.    Because of the Order's list requirements, ASA will need to divert more resources toward ensuring that students who want to register to receive a mail ballot can do so, and to explain the requirements of the Order's various lists. Because of the high likelihood of inaccuracies in the lists required by the Order, ASA staff will have to spend additional time and resources helping students navigate the process to check and update their information on these lists if possible, effectively doubling the staff time required to ensure any one student is registered and is able to vote. This time and resources will be diverted from ASA's other activities, such as its annual

49

Student Voting Summit, voter registration quality control, and educational and advocacy efforts related to higher education funding.

212. Even if ASA diverts more resources toward ensuring students can properly register and vote by mail, its mission will be frustrated by the Order because ASA will register fewer students to vote. Students are likely to be dissuaded by the additional steps and confusing requirements to properly register, receive, and return a mail ballot. Students' privacy concerns about the disclosure of their personal information pursuant to the Order's list requirements will act as an additional disincentive, discouraging more students from registering and voting, thus harming one of ASA's core organizational goals. Students who register may be unable to vote, even if ASA tries to help ensure that they are placed on the necessary list.

213. Like its members, ASA is harmed by the confusion the Order has created. ASA is unsure what steps voters can or should take to ensure their information is correct on the Mail-In and Absentee Participation List or the State Citizenship List, nor does ASA know what exactly the consequences would be to voters if their information is incorrect on any of these lists. For that reason and others, it is unable to adequately plan its voter registration and education activities, and to properly advise its members and others about what they must do to ensure they are properly registered and will be able to receive and return their mail ballots.

## CLAIMS

### COUNT I
**Unconstitutional *Ultra Vires* Presidential Action – Separation of Powers**
**(USPS Mail-In and Absentee Participation List and Ballot Transmittal Directives)**
All Plaintiffs Against Defendants Executive Office of the President, USPS, Postmaster General Steiner, USPS Board of Governors, USPS Board of Governors Members, Department of Commerce, Commerce Secretary Lutnick, Department of Justice, and Attorney General Bondi

214. Plaintiffs reallege, as though fully set forth in this paragraph, all the allegations of this Complaint.

215. Executive actions, including Executive Orders issued by a President, can be challenged as *ultra vires* when they are in excess of the President's constitutional authority. *See, e.g.*, *Chamber of Com. v. Reich*, 74 F.3d 1322, 1327-28 (D.C. Cir. 1996).

216. The President's authority to act must "stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952); *accord Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 188-89 (1999). Here, all statutory and constitutional authority runs contrary to the President's directive.

### a. The President lacks any constitutional authority for the USPS Mail-In and Absentee Participation List and Ballot Transmittal Directive

217. The Elections Clause empowers states to establish the "Times, Places and Manner" of holding federal elections, subject only to a superseding act of Congress. U.S. Const. art. I, § 4.

218. Pursuant to the Elections Clause, states have the power to regulate voting by mail, including the power to determine which voters are eligible to receive and cast their ballots by mail. *See McDonald v. Bd. of Election Comm'rs of Chicago*, 394 U.S. 802, 809-10 (1969).

219. Meanwhile, with respect to prescribing qualifications for voting, the states have final and exclusive authority. U.S. Const. art. I, § 2, cl. 1; art. II, § 1, cl. 2; amend. XVII; *see also Arizona v. Inter Tribal Council of Ariz.*, 570 U.S. 1, 17 (2013). The President has no role in setting qualifications for voting.

220. The Postal Clause in Article I, Section 8 of the U.S. Constitution gives Congress the authority "[t]o establish Post Offices and post Roads" and "[t]o make all Laws which shall be necessary and proper" for executing this task. U.S. Const. art. I, § 8; *U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 121 (1981).

51

221.    The Postal Power is vested in Congress alone; no shared or concomitant authority is afforded the President. *See Ex parte Jackson*, 96 U.S. 727, 732 (1877) ("The power possessed by Congress embraces the regulation of the entire Postal System of the country.").

222.    Using its exclusive authority, "Congress has established a detailed statutory and regulatory scheme to govern this country's vast postal system"—one that includes no role for the President beyond appointment and for-cause removal of the Governors who head the postal service. *Greenburgh*, 453 U.S. at 122; *Mail Ord. Ass'n of Am. v. U.S. Postal Serv.*, 986 F.2d 509, 519-20 n.4 (D.C. Cir. 1993).

223.    Indeed, Congress designed the modern Postal Service precisely to ensure its independence from direct presidential control, by removing the Post Office from the President's cabinet and setting up the Board of Governors to act as a "buffer" between the mail and partisan politics. *Mail Ord. Ass'n of Am.*, 986 F.2d at 519; *see also id.* at 519 n.4.

224.    Section 3(b)(iii) of the Executive Order mandates that USPS "shall not transmit mail-in or absentee ballots from any individual" that has not been "enrolled" with USPS on the "Mail-In and Absentee Participation List" described in Section 3(b)(iv).

225.    Section 3(b)(iii) acts far outside the scope of the President's constitutional authority.

226.    In instructing USPS to control which voters may cast their ballots by mail, it inserts the Executive into the administration of elections and usurps the constitutionally allocated role of the states and Congress.

227.    Likewise, Section 3(b)(iii) runs afoul of the Elections Clause by adding a new voting requirement, not enacted by any state or by Congress, that voters must be enrolled on a list provided by USPS to the state before they are eligible to vote by mail.

228.    The President has no legal authority over election administration—indeed the Constitution expressly *excludes* the President from that arena—and therefore may not delegate such power to an Executive agency. Nor does the President have the power to alter state requirements for mail voting eligibility.

229.    The President has no legal authority to direct or supervise the activities of the Postmaster General in any manner contrary to Congress's laws and regulations governing the Postal Service. The Postmaster General serves at the pleasure of the Postal Service's Governors.

230.    The President has no legal authority to circumvent federal statutes that define the Postal Service's powers, duties, limitations, organization, scope of operations, and procedural requirements for deliberative decision-making, among other features of the agency.

### b.    The USPS Ballot Transmittal Directive is incompatible with the expressed will of Congress

231.    Where the President acts in a manner "incompatible with the expressed or implied will of Congress," "the President's power is . . . at its 'lowest ebb,' and the President 'can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter.'" *LULAC II*, 2026 WL 252420, at *40 (citations omitted).

232.    Here, the President not only lacks inherent constitutional powers, but Congress (and the states) have exclusive powers over both elections and the postal service.

233.    The directive is "incompatible with the expressed or implied will of Congress," *id.*, many, many, times over.

### i.    Uniformed and Overseas Citizens Absentee Voting Act

234.    Under UOCAVA, a designated agency—the Federal Voting Assistance Program ("FVAP")—is tasked with "facilitat[ing] the delivery of marked absentee ballots of absent overseas uniformed services voters for regularly scheduled general elections for Federal office to the

appropriate election officials." *See* 52 U.S.C. § 20304(b)(1). "The head of each Government department, agency, or other entity," including USPS, "shall . . . distribute balloting materials and otherwise cooperate in carrying out" UOCAVA. 52 U.S.C. § 20301(c).

235. UOCAVA allows military and overseas voters to request an absentee ballot through the Federal Post Card Application. *See generally* 52 U.S.C. § 20303. UOCAVA also requires the creation of a federal-only ballot that military and overseas voters may use to vote in federal elections, called the Federal Write-in Absentee Ballot ("FWAB"). 52 U.S.C. § 20303(a)(1).

236. FVAP must coordinate with USPS to ensure the expedited delivery of marked ballots collected on or before the deadline to submit a UOCAVA ballot. 52 U.S.C. § 20304(b)(2). Similarly, FWABs must be issued and delivered "in the manner provided by law for absentee ballots in the State involved." 52 U.S.C.A. § 20303(b). UOCAVA provides no independent basis for refusing to deliver a timely-received absentee ballot.

237. The directive to USPS to limit delivery of absentee ballots to those "enrolled" with USPS is directly contrary to the protections for absentee and mail ballots that UOCAVA provides for uniformed and overseas civilian voters.

### ii. Postal Reorganization Act, Universal Service Mandate

238. The PRA provides that the Postal Service "shall be operated as a basic and fundamental service provided to the people by the Government . . . authorized by the Constitution, created by Act of Congress, and supported by the people." 39 U.S.C. § 101.

239. The Postal Service must "provide prompt, reliable, and efficient services to patrons *in all areas* and shall render postal services to *all communities*." *Id.* (emphasis added). And it "shall serve as nearly as practicable the entire population of the United States." *Id.* § 403.

54

240.     The Postal Service has a responsibility to "provide types of mail service to meet the needs of different categories of mail and mail users." *Id.* § 403(b)(2). And to that end, the Postal Service may establish reasonable and equitable classes of mail and rates and fees for postal services. *Id.* § 404(b).

241.     However, in providing different kinds of services, including ballot mail service, the Postal Service may not, except as specifically authorized by the PRA, "make any undue or unreasonable discrimination among users of the mails, nor shall it grant any undue or unreasonable preferences to any such user." *Id.* § 403(c).

242.     These requirements, among others, impose on the Postal Service a universal service mandate.

243.     The Postal Service's universal service mandate extends to delivery of voters' mail and absentee ballots.

244.     No act of Congress permits the Postal Service to refuse to deliver an individual's mail or absentee ballot because the individual does not appear or has not been enrolled on one or more government lists.

245.     Yet this is precisely what Section 3(b)(iii) of the Order requires the Postal Service to do, in direct contravention of Congress's universal service mandate. The Order requires the Postal Service to unduly and unreasonably discriminate among users of the mail in violation of 39 U.S.C. § 403(c), granting preference to individuals seeking to transmit mail ballots who appear on certain government lists, while refusing service to those who do not.

246.     The Order is fundamentally incompatible with the expressed will of Congress, as dictated by 39 U.S.C. §§ 101, 403, and 404.

### iii. Postal Accountability Enhancement Act

247.    Before the Postal Service may make sweeping changes to its services, it must seek an advisory opinion from the Postal Regulatory Commission ("PRC"), pursuant to the procedures outlined in Section 3661 of the PAEA. 39 U.S.C. § 3661.

248.    "When the Postal Service determines that there should be a change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis," it must first "submit a proposal . . . to the [PRC] requesting an advisory opinion on the change." *Id.* § 3661(b).

249.     The PRC may not issue an opinion on any such proposal until it has held a public hearing that accords with §§ 556 and 557 of the APA. *Id.* § 3661(c).

250.    Courts require the Postal Service to seek an advisory opinion from PRC pursuant to Section 3661 and deem an advisory opinion required when: (i) the Postal Service attempts to implement a change that would have a "meaningful impact on service," (ii) the change is "in the nature of postal services," and (iii) the change would affect service to "[a] broad geographical area." *Buchanan v. U.S. Postal Serv.*, 508 F.2d 259, 262-63 (5th Cir. 1975).

251.    The Order would have a meaningful impact on service because it requires the Postal Service to refrain from transmitting mail or absentee ballots from any individual who has not been enrolled on a Mail-In and Absentee Participation List for their state of residence.

252.     The Order's required change is in the nature of postal services because it identifies individuals to whom the Postal Service will no longer offer the delivery of mail ballots. *See* 39 U.S.C. § 102(5) (defining "postal service" as "the delivery of letters, printed matter, or mailable packages, including acceptance, collection, sorting, transportation, or other functions ancillary thereto").

253. The Order's required change would affect service to a broad geographical area. The change applies to individuals in all fifty states, and a significant number of postal customers across the nation will be affected by the Order's mandated change in service.

254. The law therefore requires that before adopting the Order's required service change, the Postal Service would have to seek an advisory opinion from the PRC, and the PRC would have to issue an advisory opinion after conducting the requisite public hearings under Section 3661.

255. By dictating that the Postal Service refuse to deliver ballots from individuals not enrolled on one or more lists, the Order precludes the deliberative process Congress established in Section 3661 for changes of this kind.

256. Rather than allow the Postal Service to determine whether this change should be made after obtaining the requisite advisory opinion after the requisite meetings, as Section 3661 requires, the Order commands the outcome, rendering Congress's mandatory procedures a nullity. The directive to deny ballot mail service to individuals not appearing on one or more lists is contrary to the express will of Congress as articulated in 39 U.S.C. § 3661.

### iv.    Postal Reorganization Act, Disclosure of Postal Patrons

257. "[N]o officer or employee of the Postal Service shall make available to the public by any means or for any purpose any mailing or other list of names or addresses (past or present) of postal patrons or other persons," except to the Secretary of Commerce for use by the Census Bureau for any census or survey. 39 U.S.C. § 412.

258. Section 3(b)(iv) of the Order directs the Postal Service to compile and transmit to each State a "Mail-In and Absentee Participation List" identifying individuals who have enrolled with the Postal Service for mail-in or absentee ballots, along with unique ballot envelope identifiers associated with those individuals.

259.    The USPS Mail-In and Absentee Participation Lists constitute "mailing or other list[s] of names or addresses . . . of postal patrons" under 39 U.S.C. § 412. The individuals on these lists are postal patrons who have engaged with the Postal Service for the purpose of transmitting mail ballots, and the lists identify them by name and unique identifiers linked to their use of postal services.

260.    The Order requires the Postal Service to transmit the Mail-In and Absentee Participation Lists to "each State," perhaps meaning the state's election officials. The Order does not define to whom precisely within "each State" the patron lists shall be transmitted.

261.    Section 412 provides for one exception to its non-disclosure rule for disclosures to the Secretary of Commerce for use by the Census Bureau, *see* 39 U.S.C. § 412(b). But state election officials among other numerous undefined individuals associated with "each State" are not the Secretary of Commerce, and the transmission is not for a census purpose.

262.    By directing the Postal Service to compile and transmit the Mail-In and Absentee Participation Lists to each State, the Order is incompatible with the tight restrictions on disclosure of data on postal patrons under 39 U.S.C. § 412.

### v. Postal Reorganization Act & Postal Service Reform Act of 2022, Non-Postal Services

263.    The Postal Service may not provide non-postal services, except for those expressly authorized by law or that were offered before January 1, 2006 and sustained upon review and approval of the PRC. 39 U.S.C. § 404(e).

264.    A non-postal service is anything other than the delivery of letters, printed matter, or mailable packages, including acceptance, collection, sorting, transportation, or other functions ancillary thereto. *Id.* §§ 404(e)(1), 102(5).

265.    The Order requires the Postal Service to compile and provide each State with a Mail-In and Absentee Participation List of individuals who have enrolled with the Postal Service for mail-in or absentee ballots, along with unique identifiers, and refrain from transmitting mail-in or absentee ballots from any unenrolled individual.

266.    Effectuating these directives would require the Postal Service to build and administer an enrollment system for mail ballot participants, generate and assign unique identifiers to individual voters, compile and maintain state-specific participation lists, and transmit those lists to each state on a recurring basis. The Postal Service would also be required to conduct sophisticated data matching before transmitting a ballot from an individual to confirm they are enrolled or otherwise to reject their mail piece, as the President directs in his Order.

267.    These directives require the Postal Service to provide one or more non-postal service within the meaning of 39 U.S.C. §§ 404(e)(1) and 102(5).

268.    The compilation, maintenance, and transmission of Mail-In and Absentee Participation Lists to states, the administration of an enrollment program for voters seeking to vote by mail, and the data analysis required to fulfill a directive to refuse ballot mail service to unenrolled individuals is not "the delivery of letters, printed matter, or mailable packages, including acceptance, collection, sorting, transportation, or other functions ancillary thereto." *Id.* § 102(5). These are election-administration services that Congress has never authorized the Postal Service to provide.

269.    Notwithstanding Section 404(e), the Postal Service may provide non-postal services to an agency of a State government under 39 U.S.C. § 3703, but only through a program that satisfies each of the following statutory conditions: (i) the non-postal services must provide enhanced value to the public; (ii) the non-postal services must not interfere with or detract from

the value of postal services; (iii) the agreements must provide a net contribution to the Postal Service, defined as reimbursement covering at least 100% of the costs attributable to the services provided in each year; (iv) the Governors of the Postal Service must approve the program by a recorded vote, made available on its website, with a majority of Governors then in office voting for approval; and (v) within 90 days after offering the service, the Postal Service must make available to the public the agreement with the agency and a business plan describing the service, the enhanced value to the public, and terms of reimbursement. 39 U.S.C. § 3703(a)-(c).

270. The Order directs the Postal Service to provide non-postal services to states without satisfying any of Section 3703's statutory conditions. No determination has been made that the service provides enhanced value to the public without detracting from postal services—indeed, the opposite is true. No provision has been made for reimbursement of the Postal Service to cover the costs attributable to this new service. The Governors have not approved the program by recorded vote posted on the Postal Service website. Upon information and belief, no agreement has been executed to provide these services to any state. And no business plan has been made publicly available.

271. To the extent the Order directs the Postal Service to provide this non-postal service to or on behalf of the Executive Office of the President, Section 3704 permits the Postal Service to provide non-postal services to other government agencies, but only through a program that provides a net contribution to the Postal Service, defined as reimbursement covering at least 100% of the costs attributable to the services provided in each year. 39 U.S.C. § 3704.

272. The Order does not provide for reimbursement of the Postal Service's costs in fulfilling its directives and does not identify any source of funding for this purpose. Upon

information and belief, Congress has not appropriated funds for the development or operation of the program the Order directs.

273. The Postal Service is also required to submit annual reports to the PRC analyzing costs, revenues, rates, and quality of service for non-postal services provided under Sections 3703 and 3704. 39 U.S.C. § 3705(a)-(b). The PRC must make determinations of the Postal Service's compliance with Chapter 37 of Title 39 regarding the non-postal service and may order discontinuance of persistently noncompliant services. *Id.* § 3705(e).

274. The Order bypasses every procedural safeguard Congress has established for the Postal Service's provision of non-postal services. The Order is incompatible with the express will of Congress limiting the USPS's non-postal services as articulated in 39 U.S.C. §§ 404(e), 3703, 3704, and 3705.

* * *

275. Because Sections 3(b)(iii) and (iv)—directing the creation of the Mail-In Absentee Participation List and restricting ballot delivery to those on said list—are "contrary to the express will of Congress as articulated in UOCAVA" and numerous USPS-related statutes, "because there is neither statutory nor constitutional authority" for those directives, and "because our Constitution entrusts matters of election regulation exclusively to Congress and the States" and matters governing the USPS exclusively to Congress, the directives are beyond the President's constitutional authority and cannot be lawfully implemented. *LULAC II*, 2026 WL 252420, at *40.

276. All plaintiffs are and will continue to be irreparably harmed by these *ultra vires* actions.

## COUNT II
### Unconstitutional Ultra Vires Presidential Action – Separation of Powers
### (State Citizenship List)
All Plaintiffs Against Defendants Executive Office of the President, DHS, Homeland Security Secretary Mullin, USCIS, USCIS Director Edlow, SSA, SSA Commissioner Bisignano, Department of Commerce, Commerce Secretary Lutnick, Department of Justice, and Attorney General Bondi

277.    Plaintiffs reallege, as though fully set forth in this paragraph, all the allegations of this Complaint.

278.    Executive actions, including Executive Orders issued by a President, can be challenged as *ultra vires* when they are in excess of the President's constitutional authority. *See, e.g.*, *Chamber of Com.*, 74 F.3d at 1327-28.

279.    The President's authority to act must "stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co.*, 343 U.S. at 585; *accord Mille Lacs Band of Chippewa Indians*, 526 U.S. at 188-89.

280.    The Constitution delegates election administration primarily to the states, subject to regulation by Congress. *See* U.S. Const. art. I, § 4. As this Court has recognized, the Constitution "assigned no role at all to the President" in election administration. *LULAC II*, 2026 WL 252420, at *1.

281.    Accordingly, no constitutional authority authorizes the President's creation of State-specific "list[s] of individuals confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election and who maintain a residence in the subject State." Order § 2(a).

282.    As the Order itself identifies, the purpose of the State Citizenship List is to "assist in verifying identity and Federal election voter eligibility." *Id.* § 1. The creation of such State Citizenship List to "assist in verifying identity and Federal election voter eligibility" would

constitute an entirely unauthorized executive intervention into election administration. Finally, the Order directs the Attorney General to prioritize the investigation and prosecution of state and local officials or other election administration personnel who issue federal ballots who ostensibly do not satisfy the qualifications the State Citizenship List purports to verify, and to "provide guidance to election officials, including any instrumentalities thereof; contractors; individuals involved in the administration of Federal elections; or public or private entities engaged in the printing, production, shipment, or distribution of ballots" and, later on, encourages referral of those same entities for investigation or prosecution. *Id.* § 4(b). Thus, the Order clearly demonstrates an intent not only to try to insert the Executive into list maintenance, but to unlawfully pressure states into following the Order's dictates.

283.   Only Congress and the states have the authority to build procedures and data systems for verifying voters and conducting voter list maintenance.

284.   Absent congressional authorization, then, the President cannot mandate the creation of the State Citizenship Lists. But Congress has assigned no role to the President, Department of Homeland Security, nor the Social Security Administration which would authorize those agencies to create the State Citizenship Lists to "assist in verifying identity and Federal election voter eligibility."

285.   To the contrary, Congress has specifically created a legislative roadmap for voter registration, voter eligibility verification, and voter list maintenance.  *See, e.g.*, 52 U.S.C. § 20501 *et seq.* (National Voter Registration Act); 52 U.S.C. § 21081 *et seq.* (Help America Vote Act). In doing so, Congress created no role for the President or executive branch in directing, supervising, or even partnering with states or localities in individualized voter verification or list maintenance. Rather, it set general parameters for state and local officials to administer and expressly prescribed

63

that "[t]he specific choices on the methods of complying with the requirements" of list maintenance and eligibility determinations "shall be left to the discretion of the State." 52 U.S.C. § 21085.

286.    Moreover, the creation of the list contravenes the Privacy Act, which sets forth the specific uses of an individual's records by federal agencies. The Privacy Act does not independently authorize the President, DHS, nor SSA to create these State Citizenship Lists because, among other procedural and technical defects, the data use contemplated by the Order would not constitute a use permitted under the Act. See 5 U.S.C. § 552a(b)(1)-(13).

287.    Where the President acts in a manner "incompatible with the expressed or implied will of Congress," "the President's power is . . . at its 'lowest ebb,' and the President 'can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter.'" *LULAC II*, 2026 WL 252420, at *40 (citations omitted). Here, the President has no such powers.

288.    Section 3(b)(i)—by directing DHS and SSA to create a series of lists identifying United States citizens of voting age for the purpose of "assist[ing] in verifying identity and Federal election voter eligibility"—runs contrary to federal law by purporting to require federal agencies to undertake a task specifically left to the states by Congress, and purporting to require an action not otherwise authorized under federal law. Courts addressing similar efforts by the President to conduct list maintenance *sua sponte* have concluded that the President's demands amount to an "overreach and misuse" of its role in election administration beyond constitutional limits. *United States v. Oregon*, No. 6:25-cv-01666-MTK, 2026 WL 318402, at *13 (D. Or. Feb. 5, 2026); *see also United States v. Weber*, No. 2:25-cv-09149-DOC-ADS, 2026 WL 118807, at *20 (C.D. Cal. Jan. 15, 2026) ("[T]he Executive may not unilaterally usurp the authority over elections . . . ").

289.    "[B]ecause our Constitution entrusts matters of election regulation exclusively to Congress and the States," and the President is asserting authority not otherwise granted to him, the creation of the State Citizenship Lists under § 3(b)(i) of the Executive Order is beyond the President's constitutional authority and cannot be lawfully implemented. *LULAC II*, 2026 WL 252420, at *40.

290.    All plaintiffs are and will continue to be irreparably harmed by this *ultra vires* action.

## COUNT III

**Violation of the APA, 5 U.S.C. § 706(2)(A), (C), (D) (Agency Action Contrary to Law and Procedure)**

**(State Citizenship List – Failure to follow procedural requirements for systems of records)**

All Plaintiffs Against Defendants DHS, Homeland Security Secretary Mullin, USCIS, USCIS Director Edlow, SSA, SSA Commissioner Bisignano, Department of Commerce, Commerce Secretary Lutnick

291.    Plaintiffs reallege, as though fully set forth in this paragraph, all the allegations of this Complaint.

292.    The APA requires courts to "hold unlawful and set aside agency action" that is "not in accordance with law," 5 U.S.C. § 706(2)(A), "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C), or "without observance of procedure required by law," *id.* § 706(2)(D).

293.    Section 2(a) of the Executive Order places a non-discretionary duty on Defendants DHS, SSA, and other agencies that house data to "compile and transmit" a State Citizenship List to States no fewer than 60 days before each regularly scheduled federal election, *i.e.*, before September 4, 2026.

294.    The Executive Order, therefore, requires Defendants to take action to "compile and transmit" a "State Citizenship List" that is "derived from Federal citizenship and naturalization records, SSA records, SAVE data, and other relevant federal databases." Order § 2(a). This constitutes "final agency action for which there is no other adequate remedy in a court" and is subject to judicial review under the APA. 5 U.S.C. § 704.

295.    Defendants DHS, SSA, and any other agency that operates "relevant federal databases" within the meaning of the Executive Order are "agenc[ies] that maintain[] a system of records," pursuant to the Privacy Act. 5 U.S.C. § 552a(e).

296.    Defendants have failed to comply with the Privacy Act's requirements and protections accorded to a "system of records." *Id.* § 552a(e)(1)-(12).

297.    Defendants have failed to "maintain in its records only such information about an individual" as is "relevant and necessary" to "accomplish a purpose of the agency required . . . by statute or by executive order of the President." *Id.* § 552a(e)(1).

298.    The creation of a State Citizenship List is not "relevant and necessary" to accomplish the purposes for which the SSA database, the SAVE database, and records related to Federal citizenship and naturalization were designed. Indeed, the creation of a State Citizenship List is not "relevant and necessary" to accomplish the purposes of any federal database that could fall within the EO because the federal government has no authority anywhere in statute or the Constitution to create and maintain such lists.

299.    Defendants have failed to "collect information to the greatest extent practicable directly from the subject individual when the information may result in adverse determinations about an individual's rights." *Id.* § 552a(e)(2). Because the information in the State Citizenship List will be used to determine an individual voter's eligibility and that may result in an adverse

66

determination—i.e., removal of the individual from the voter rolls, denial of the right to vote, or disqualification from the Mail-In and Absentee Voter Participation List—the Privacy Act requires Defendants to have made an effort to collect information directly from the individual.

300. Defendants have failed to "maintain all records which are used by the agency in making any determination about any individual with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the determination," 5 U.S.C. § 552a(e)(5). The information on individuals available in these federal databases routinely contains inaccuracies. At a minimum, Defendants would need to implement robust validation and correction processes to meet their obligations under § 552a(e)(5). Defendants cannot meet their statutory obligations under § 552a(e)(5) because the Order does not include adequate verification mechanisms, and because the Executive Order's mandate that the State Citizenship List must be updated and transmitted no fewer than 60 days before the next federal election, i.e., *before* September 4, 2026, it does not provide Defendants sufficient time to satisfy their statutory obligations under this provision.

301. Defendants have failed to "make reasonable efforts to assure that such records are accurate, complete, timely, and relevant for agency purposes" "prior to disseminating any record about an individual to any person other than an agency." *Id.* § 552a(e)(6). The Executive Order requires Defendants transmit the State Citizenship List to state election officials 60 days before any federal election. Given the tight timeline and the inherent unreliability of SAVE and SSA data as well as data in other federal databases, Defendants have not made reasonable efforts to meet their statutory obligations under this provision.

302. Defendants have failed to establish the "rules of conduct for persons involved in the design, development, operation, or maintenance of any system of records." *Id.* § 552a(e)(9).

67

Nor have they "establish[ed] appropriate administrative, technical, and physical safeguards to insure the security and confidentiality of records" and "to protect against any anticipated threats or hazards to their security or integrity." *Id.* § 552a(e)(10).

303.    Furthermore "any new use or intended use of the information in the system" requires Defendants to publish a notice in the Federal Register and provide an opportunity for notice and comment by members of the public. *Id.* § 552a(e)(11). Defendants have failed to do so.

304.    Any "matching program" that relies on the State Citizenship List to compare listed individuals against state databases for the purpose of verifying their eligibility to vote must be preceded by advanced publication of notice in the Federal Register before the program starts. Defendants have not published such a notice. *Id.* § 552a(e)(12).

305.    Defendants have not met the technical and procedural requirements for creating a new system of records under 5 U.S.C. § 552a(e).

306.    Accordingly, Defendants' creation of a new system of records, i.e., the State Citizenship list, is "not in accordance with law," *id.* § 706(2)(A), "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C), and "without observance of procedure required by law," *id.* § 706(2)(D).

### COUNT IV
**Violation of the Privacy Act, 5 U.S.C. § 706(2)(A), (C), (D)**
**(Agency Action Contrary to the Privacy Act)**
**(State Citizenship List—Improper Disclosure)**
All Plaintiffs Against Defendants DHS, Homeland Security Secretary Mullin, USCIS, USCIS Director Edlow, SSA, SSA Commissioner Bisignano, Department of Commerce, Commerce Secretary Lutnick

307.    Plaintiffs reallege, as though fully set forth in this paragraph, all the allegations of this Complaint.

308. The APA requires courts to "hold unlawful and set aside agency action" that is "not in accordance with law," 5 U.S.C. § 706(2)(A), "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C), or "without observance of procedure required by law," *id.* § 706(2)(D).

309. The Executive Order directs DHS, through the Director of USCIS "in coordination with" the Commissioner of SSA to "take appropriate action to compile" the State Citizenship Lists derived from Federal citizenship and naturalization records, SSA records, SAVE data and other relevant Federal databases. Order § 2. Defendants' creation of the State Citizenship Lists constitutes "final agency action for which there is no other adequate remedy in a court" and is subject to judicial review under the APA. 5 U.S.C. § 704.

310. The Privacy Act generally prohibits the disclosure of any record in a system of records to any person or another agency without the prior consent of the individual to whom the record pertains, unless it fits with an enumerated exception. *See* 5 U.S.C. § 552a(b)(1)-(13).

311. The disclosure of individual records between SSA, DHS, and any other agency that maintains "relevant Federal databases" for the purpose of compiling the State Citizenship Lists is improper.

312. Likewise, the disclosure of the State Citizenship Lists to state election officials is improper.

313. These disclosures do not fit any of the exceptions under the Privacy Act.

314. The disclosure of records between agencies and to state election officials does not fall within the routine use exception. 5 U.S.C. § 552a(a)(7) (use "for a purpose which is compatible with the purpose for which [the record] was collected").

69

315. None of the other exceptions are applicable to the disclosure of individual records under the EO.

316. Because Defendants' creation and dissemination of the State Citizenship Lists do not meet any exception to the Privacy Act's general prohibition on disclosure, these provisions of the EO violate the Privacy Act.

317. Therefore, Defendants' actions under the EO to compile and transmit the State Citizenship Lists to state election officials are "not in accordance with law," *id.* § 706(2)(A), are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C), and are "without observance of procedure required by law," *id.* § 706(2)(D).

318. All Plaintiffs are and will continue to be irreparably harmed by this action. This harm is imminent as the EO requires that the "Secretary of Homeland Security shall, within 90 days of the date of this order, establish the infrastructure necessary to compile, maintain, and *transmit* the State Citizenship List." Order § 4(c) (emphasis added).

## <u>COUNT V</u>
### Violation of the APA, 5 U.S.C. § 706(2)(A), (C), (D) (Law and Procedure))
**(Failure to follow procedural requirements for system of records, i.e., Mail-In and Absentee Participation Lists)**
All Plaintiffs Against Defendants USPS, Postmaster General Steiner, USPS Board of Governors, USPS Governors Board Members, Department of Commerce, Commerce Secretary Lutnick

319. Plaintiffs reallege, as though fully set forth in this paragraph, all the allegations of this Complaint.

320. The APA requires courts to "hold unlawful and set aside agency action" that is "not in accordance with law," 5 U.S.C. § 706(2)(A), "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C), or "without observance of procedure required by law," *id.* § 706(2)(D), (C).

321.    Defendants are "agenc[ies] that maintain[] a system of records," and are therefore subject to the requirements of the Privacy Act. 5 U.S.C. § 552a(e).

322.    The Privacy Act expressly applies to USPS. 39 U.S.C. § 410.

323.    Defendants' creation and transmission of the Mail-In and Absentee Participation Lists, pursuant to the EO, constitutes "final agency action for which there is no other adequate remedy in a court" and is subject to judicial review under the APA. 5 U.S.C. § 704.

324.    Defendants have failed to "maintain all records which are used by the agency in making any determination about any individual with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the determination," 5 U.S.C. § 552a(e)(5).

325.    USPS does not make any determinations about residence. USPS does not maintain any lists of its own. The information USPS has is based on what people give USPS when they send mail. There are many reasons why people send mail to addresses that are not their residences. Therefore, Defendants do not have accurate information available to "provide each State with a list of individuals [] who are enrolled with the USPS . . . for mail-in or absentee ballots provided by such State." Order § 3(b)(iv).

326.    Defendants have failed to "make reasonable efforts to assure that such records are accurate, complete, timely, and relevant for agency purposes" "prior to disseminating any record about an individual to any other person other than [the] agency." 5 U.S.C. § 552a(e)(6). The Executive Order requires Defendants to transmit the Absentee and Mail-In Participation Lists to states. By relying on inaccurate residency information, Defendants have failed to meet their obligations to ensure the records they maintain on individuals are accurate, timely, and relevant to prevent substantial harm and unfairness. *See id.* § 552a(e)(6). This includes residence information

71

for students and military-affiliated and overseas voters, among others, who may retain legal residency in their home state for voting without maintaining an in-state presence due to their obligations out-of-state.

327.    Accordingly, Defendants' actions are "not in accordance with law," 5 U.S.C. § 706(2)(A), are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C), and are "without observance of procedure required by law," *id.* § 706(2)(D).

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, declare that Sections 2(a), 3(b)(iii), and 3(b)(iv) of the Order are unconstitutional or otherwise unlawful, retain jurisdiction to render any and all further orders that this Court may deem necessary, award Plaintiffs their attorneys' costs and fees pursuant to statute, and award any other relief that the Court deems necessary and just, including using its equitable powers to enter interim, preliminary, and permanent orders providing that:

A. Defendants are enjoined from implementing or giving effect to Sections 2(a), 3(b)(iii), and 3(b)(iv) of the Order in any way;

B. Defendants are directed to rescind any and all guidance or direction that has already been issued that relates to implementing or enforcing Sections 2(a), 3(b)(iii), and 3(b)(iv) of the Order; and

C. Defendants are directed to take, in good faith, any other steps that are necessary to prevent the implementation or enforcement of Sections 2(a), 3(b)(iii) of the Order.

Dated: April 2, 2026

Respectfully submitted,

*/s/ Norman L. Eisen*
Norman L. Eisen (DC Bar No. 435051)
Tianna J. Mays (DC Bar No. 90005882)
Pooja Chaudhuri (DC Bar No. 888314523)
Sofia Fernandez Gold (DC Bar No. 90010196)
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE #15180
Washington, D.C. 20003
(202) 601-8678
norman@democracydefenders.org
tianna@democracydefenders.org
pooja@democracydefenders.org
sofia@democracydefenders.org

*\*admission to D.D.C. forthcoming*


*Counsel for Plaintiffs LULAC, SFI, and ASA*

*/s/ Danielle Lang*
Danielle Lang (DC Bar No. 1500218)
Robert Brent Ferguson (DC Bar No. 1782289)
Anna Baldwin (DC Bar No. 998713)
Sejal Jhaveri (NY Bar No. 5396304)*
Valencia Richardson (DC Bar No. 1739245)
Aseem Mulji (DC Bar No. 1724971)
Heather Szilagyi (DC Bar No. 90006787)
Renata O'Donnell (DC Bar No. 1723929)
Benjamin Phillips (DC Bar No. 90005450)
CAMPAIGN LEGAL CENTER
1101 14th St. NW, Suite 400
Washington, D.C. 20005
(202) 736-2200
dlang@campaignlegalcenter.org
bferguson@campaignlegalcenter.org
abaldwin@campaignlegalcenter.org
sjhaveri@campaignlegalcenter.org
vrichardson@campaignlegalcenter.org
amulji@campaignlegalcenter.org
hszilagyi@campaignlegalcenter.org
rodonnell@campaignlegalcenter.org
bphillips@campaignlegalcenter.org