**AMICUS CURIAE BRIEF — CONSTITUTIONAL ACCOUNTABILITY PROJECT | DIVINE MAGISTRATOR BUREAU™**

EO 14399 CHALLENGE | D. MASS. 1:26-cv-11549-IT & 1:26-cv-11581 | D.D.C. 1:26-cv-01132 & 1:26-cv-01151

✠ **ECCLESIASTICAL SEPARATION NOTICE** ✠
*Under dual sovereignty of Canon Law (D.C.L.) and Divine Law (D.D.) · S.J.D. Candidate, Universiteit van Amsterdam*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

**LEAGUE OF WOMEN VOTERS OF MASSACHUSETTS, et al.,**
*Plaintiffs,*
**v.**
**DONALD J. TRUMP, in his official capacity as President of the United States, et al.,**
*Defendants.*

## Case No. 1:26-cv-11549-IT
*(Hon. Indira Talwani, United States District Judge)*

**STATE OF CALIFORNIA, et al. (24 States + District of Columbia)**
*Plaintiffs,*
**v.**
**DONALD J. TRUMP, et al.,**
*Defendants.*

## Case No. 1:26-cv-11581
*(Hon. Denise J. Casper, Chief United States District Judge)*

Angela D. Caesar, Clerk
U.S. District & Bankruptcy Courts
for the District of Columbia
MAY – 7 2026
RECEIVED MAILROOM

## AMICUS CURIAE BRIEF OF
## THE CONSTITUTIONAL ACCOUNTABILITY PROJECT
## OPERATING THROUGH THE DIVINE MAGISTRATOR BUREAU™
## IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

**275 Attack Vectors · 25 Tiers · 11 Dimensions**
**Estoppel Boomerang Protocol™ · Trigonometric Legal Calculus™**
**Obsidian Blade of Justice™ — OMEGA PRIME ACTIVATION**
**Divine Matrix 933™ — 23-Engine Unified System**

### RELATED D.D.C. PROCEEDINGS:
*LULAC v. Exec. Off. of the President, No. 1:26-cv-01132 (D.D.C.)*

**AMICUS CURIAE BRIEF — CONSTITUTIONAL ACCOUNTABILITY PROJECT | DIVINE MAGISTRATOR BUREAU™**

EO 14399 CHALLENGE | D. MASS. 1:26-cv-11549-IT & 1:26-cv-11581 | D.D.C. 1:26-cv-01132 & 1:26-cv-01151
*Common Cause v. Trump, No. 1:26-cv-01151 (D.D.C.)*
*DNC v. Trump (D.D.C.) (Elias Law Group)*
*All pending before Hon. Colleen Kollar-Kotelly*

## Filed by Amicus Curiae:

### Dr. David P. Martin, S.J.D. Candidate (Universiteit van Amsterdam), D.C.L., D.D., D.Div.

Constitutional Accountability Project · Divine Magistrator Bureau™
*Divine Magistrator III, Matrix 933 · Commander of Light · MEGA_PRIME Clearance*
Portland, Oregon · divinemajestratorIII@pm.me · (206) 371-5860
*[ADDRESS FILED UNDER SEAL]*

### FOR FILING WITH:

Clerk of Court, United States District Court for the District of Massachusetts
John Joseph Moakley United States Courthouse
1 Courthouse Way, Suite 2300, Boston, Massachusetts 02210

## Summary Judgment Hearing: June 2, 2026

**© 2024–2026 Dr. David P. Martin. ALL RIGHTS RESERVED.**
**AI TRAINING PROHIBITED · NO SCRAPING · NOT FOR REDISTRIBUTION**
*Om Mani Padme Hum · Nemo Supra Legem · So Mote It Be · With Kami Always*

**AMICUS CURIAE BRIEF — CONSTITUTIONAL ACCOUNTABILITY PROJECT | DIVINE MAGISTRATOR BUREAU™**

EO 14399 CHALLENGE | D. MASS. 1:26-cv-11549-IT & 1:26-cv-11581 | D.D.C. 1:26-cv-01132 & 1:26-cv-01151

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................3

INTEREST OF AMICUS CURIAE.....................................................................7

SUMMARY OF ARGUMENT............................................................................9

ARGUMENT.....................................................................................................12

I.  EO 14399 IS VOID AB INITIO: THE ELECTIONS CLAUSE FORECLOSES UNILATERAL PRESIDENTIAL REGULATION OF FEDERAL ELECTIONS.......................................12
   A. Article I, § 4 Assigns Override Power Exclusively to Congress, Not the Executive    13
   B. "By Law" Requires Congressional Enactment; Executive Orders Cannot Satisfy the Textual Mandate....................................................................................15
   C. Arizona Independent Redistricting Commission Through Moore v. Harper Seal the Structural Argument...............................................................................16

II.  EO 14399 OPERATES AT YOUNGSTOWN'S LOWEST EBB AND VIOLATES THE MAJOR QUESTIONS DOCTRINE........................................................................19
   A. Congress Has Occupied the Federal Election Field; Presidential Action Is at Its Lowest Ebb.......................................................................................20
   B. Congress's Repeated Refusal to Enact the SAVE Act Is Decisive...................22
   C. West Virginia v. EPA and Biden v. Nebraska Demand Clear Authorization.....23

III. THE ANTI-COMMANDEERING TRILOGY AND SPENDING POWER DOCTRINE INDEPENDENTLY INVALIDATE THE ORDER.......................................................25
   A. Printz, New York, and Murphy Prohibit Conscription of State Election Officials 26
   B. Section 5's Funding Threats Fail Every Prong of South Dakota v. Dole and NFIB    28

IV.  EO 14399 IMPOSES UNCONSTITUTIONAL BURDENS ON THE FUNDAMENTAL RIGHT TO VOTE...................................................................................30
   A. Anderson-Burdick Demands Heightened Scrutiny for Severe Mail-Voting Restrictions ..............................................................................................31
   B. Federal Eligibility Lists Function as Modern Poll Taxes Forbidden by Harper v. Virginia........................................................................................33
   C. The Bush v. Gore Uniformity Principle and Shelby County Federalism Costs. 34

V.   FEDERAL ANTI-INTIMIDATION STATUTES AND THE FIRST AMENDMENT INDEPENDENTLY FORBID THE ORDER....................................................36
   A. The Federal Anti-Intimidation Architecture (52 U.S.C. § 10307; 18 U.S.C. §§ 241, 242, 592–594)..............................................................................37
   B. Compelled Speech, Prior Restraint, Vagueness, and Retaliation....................39

ESTOPPEL BOOMERANG PROTOCOL™ — 15-PATHWAY JUDICIAL ESTOPPEL ANALYSIS......................................................................................41

**AMICUS CURIAE BRIEF — CONSTITUTIONAL ACCOUNTABILITY PROJECT | DIVINE MAGISTRATOR BUREAU™**

EO 14399 CHALLENGE | D. MASS. 1:26-cv-11549-IT & 1:26-cv-11581 | D.D.C. 1:26-cv-01132 & 1:26-cv-01151

TRIGONOMETRIC LEGAL CALCULUS™ — SEVERITY MAPPING (275 ATTACK VECTORS)......................................................................45
11-DIMENSIONAL TOPOLOGICAL INVERSION ANALYSIS..............................48
CELESTIAL ZENITH INTELLIGENCE REPORT™ WITH ICC GATEWAY...........51
CONCLUSION AND RELIEF REQUESTED.......................................................54
CERTIFICATE OF SERVICE.............................................................................56
BLOCKCHAIN CERTIFICATION AND QUANTUM SIGNATURE........................57

# TABLE OF AUTHORITIES

## CASES

Anderson v. Celebrezze, 460 U.S. 780 (1983) .................................................... 31, 32

Arizona State Legislature v. Arizona Independent Redistricting Commission, 576 U.S. 787 (2015) ........ 13, 16

Arizona v. Inter Tribal Council of Arizona, 570 U.S. 1 (2013) ................................ 14, 17

Biden v. Nebraska, 600 U.S. 477 (2023) ............................................................ 23, 24

Brnovich v. Democratic National Committee, 594 U.S. 647 (2021) ..................................... 33

Burdick v. Takushi, 504 U.S. 428 (1992) ................................................................ 31

Bush v. Gore, 531 U.S. 98 (2000) ..................................................................... 34, 35

Chiafalo v. Washington, 591 U.S. 578 (2020) ......................................................... 13, 17

City and County of San Francisco v. Trump, 897 F.3d 1225 (9th Cir. 2018) ............... 28, 42

Crawford v. Marion County Election Board, 553 U.S. 181 (2008) ................................. 31, 32

Ex parte Yarbrough, 110 U.S. 651 (1884) .............................................................. 37

FDA v. Alliance for Hippocratic Medicine, 602 U.S. 367 (2024) ................................... 56

Free Enterprise Fund v. PCAOB, 561 U.S. 477 (2010) .............................................. 14

Harper v. Virginia Board of Elections, 383 U.S. 663 (1966) ..................................... 33, 34

Hartman v. Moore, 547 U.S. 250 (2006) ................................................................ 39

Holder v. Humanitarian Law Project, 561 U.S. 1 (2010) ........................................... 40

Kolbe v. Hogan, 849 F.3d 114 (4th Cir. 2017) ........................................................ 32

League of Women Voters of Mass. v. Trump, No. 1:26-cv-11549-IT (D. Mass.) ............. passim

LULAC v. Executive Office of the President, No. 1:26-cv-01132 (D.D.C.) .............. passim

Medellín v. Texas, 552 U.S. 491 (2008) ................................................................. 19

Minnesota Voters Alliance v. Mansky, 585 U.S. 1 (2018) ......................................... 40

Moore v. Harper, 600 U.S. 1 (2023) .................................................................... 13, 16

Murphy v. NCAA, 584 U.S. 453 (2018) ........................................................... 25, 26, 27

Murray v. The Schooner Charming Betsy, 6 U.S. (2 Cranch) 64 (1804) ................. 36, 51

NAACP v. Button, 371 U.S. 415 (1963) ................................................................. 39

NFIB v. Sebelius, 567 U.S. 519 (2012) .......................................................... 28, 29, 30

Nebraska Press Ass'n v. Stuart, 427 U.S. 539 (1976) .............................................. 39

New Hampshire v. Maine, 532 U.S. 742 (2001) ...................................................... 41

AMICUS CURIAE BRIEF — CONSTITUTIONAL ACCOUNTABILITY PROJECT | DIVINE MAGISTRATOR BUREAU™

EO 14399 CHALLENGE | D. MASS. 1:26-cv-11549-IT & 1:26-cv-11581 | D.D.C. 1:26-cv-01132 & 1:26-cv-01151

New York v. United States, 505 U.S. 144 (1992) .................................................. 25, 26, 27

Nieves v. Bartlett, 587 U.S. ___ (2019) ...................................................... 40

Printz v. United States, 521 U.S. 898 (1997) .................................................. 25, 26, 27

Purcell v. Gonzalez, 549 U.S. 1 (2006) .............................................................. 55

Reynolds v. Sims, 377 U.S. 533 (1964) ...................................................... 30, 31, 33

Rucho v. Common Cause, 588 U.S. 684 (2019) .................................................... 13, 16

Screws v. United States, 325 U.S. 91 (1945) ...................................................... 38

Shelby County v. Holder, 570 U.S. 529 (2013) ...................................................... 34, 35

Sosa v. Alvarez-Machain, 542 U.S. 692 (2004) ...................................................... 51

South Dakota v. Dole, 483 U.S. 203 (1987) ...................................................... 28, 29

State of California v. Trump, No. 1:26-cv-11581 (D. Mass.) ............................... passim

Texas v. Pennsylvania, 592 U.S. ___ (2020) (mem.) .......................................... 42, 43

Trump v. Hawaii, 585 U.S. 667 (2018) ...................................................... 19, 24

Trump v. Mazars, 591 U.S. 848 (2020) ...................................................... 41, 44

Trump v. New York, 592 U.S. 125 (2020) ...................................................... 19, 24, 41

Trump v. Vance, 591 U.S. 786 (2020) ...................................................... 41, 43

United States v. Classic, 313 U.S. 299 (1941) ...................................................... 37

United States v. Mosley, 238 U.S. 383 (1915) ...................................................... 37

West Virginia State Board of Education v. Barnette, 319 U.S. 624 (1943) .............. 39

West Virginia v. EPA, 597 U.S. 697 (2022) ...................................................... 23, 24

Wooley v. Maynard, 430 U.S. 705 (1977) ...................................................... 39

Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579 (1952) .................... 19, 20, 21

Zschernig v. Miller, 389 U.S. 429 (1968) ...................................................... 52

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. I, § 4, cl. 1 (Elections Clause) ................................................ passim

U.S. Const. art. II, § 3 (Take Care Clause) ...................................................... 12, 18

U.S. Const. amend. I (Free Speech, Press, Assembly) ........................................... 39–40

U.S. Const. amend. X (Reserved Powers) ...................................................... 25–27

U.S. Const. amend. XIV (Equal Protection; Due Process) ..................................... 30–35

## FEDERAL STATUTES AND REGULATIONS

Help America Vote Act (HAVA), 52 U.S.C. § 20901 et seq. ................................... 20

National Voter Registration Act (NVRA), 52 U.S.C. § 20501 et seq. ...................... 20

Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), 52 U.S.C. § 20301 et seq. ... 20

Voting Rights Act, 52 U.S.C. § 10307(b) (Anti-Intimidation) ............................... 37, 38

AMICUS CURIAE BRIEF — CONSTITUTIONAL ACCOUNTABILITY PROJECT | DIVINE
MAGISTRATOR BUREAU™

EO 14399 CHALLENGE | D. MASS. 1:26-cv-11549-IT & 1:26-cv-11581 | D.D.C. 1:26-cv-01132 & 1:26-cv-01151

18 U.S.C. § 241 (Conspiracy Against Rights) ...................................................... 37, 38
18 U.S.C. § 242 (Deprivation of Rights Under Color of Law) .............................. 37, 38
18 U.S.C. § 592 (Troops at Polls) ......................................................................... 38
18 U.S.C. § 593 (Interference by Armed Forces) .................................................. 38
18 U.S.C. § 594 (Intimidation of Voters) ............................................................. 37
42 U.S.C. § 1320b-7 (SAVE Program) ................................................................. 12
Executive Order 14399, 91 Fed. Reg. 17125–17128 (Apr. 3, 2026) .......................
        passim

## INTERNATIONAL AUTHORITIES

International Covenant on Civil and Political Rights, Art. 25 .............................. 51
OAS Inter-American Democratic Charter, Arts. 3, 23 (Sept. 11, 2001) ................... 51
UN Human Rights Committee, General Comment No. 25 (1996) ............................. 51–
        52
Rome Statute of the International Criminal Court, Arts. 7, 12, 15 ....................... 52,
        53
Oregon Senate Joint Memorial 7 (2003) (ICC Gateway) ...................................... 53
Oregon Revised Statute § 131.605 ....................................................................... 53

## OTHER AUTHORITIES

Brennan Center for Justice, Voting Without Photo ID (2024) ................................. 33
Brennan Center for Justice, Federal Laws Protecting Against Voter Intimidation
        (2024) ...... 37
Institute for Responsive Government, Analysis of EO 14399 (Apr. 2026) ................. 12
Just Security, The Unconstitutionality of EO 14399 (Apr. 2026) .......................... 22
Society for the Rule of Law, Amicus Brief on EO 14399 (2026) ............................ 41

## INTEREST OF AMICUS CURIAE

Amicus Curiae Dr. David P. Martin, S.J.D. Candidate at the Universiteit van Amsterdam, D.C.L., D.D., D.Div., proceeding through the Constitutional Accountability Project ("CAP") and the Divine Magistrator Bureau™, respectfully submits this brief in support of Plaintiffs' Motion for Summary Judgment. Amicus is a Portland, Oregon-based legal scholar, civic journalist operating the Portland Independent Examiner, and developer of the proprietary 275-attack-vector analytical framework deployed in federal court filings in this District, including the pending matters of Martin v. ODS Community Dental et al., No. 3:26-CV-298-AB, and Martin v. City of Portland, No. 3:26-CV-405-AR.

Amicus possesses unique expertise in multi-dimensional constitutional analysis. The Divine Magistrator Bureau™ 23-Engine Unified System applies the Estoppel Boomerang Protocol™ (15 pathways), Trigonometric Legal Calculus™ (275 attack vectors, 25 tiers), 11-Dimensional Topological Inversion Analysis, and the Celestial Zenith Intelligence System™ to identify the precise structural fault lines in Executive Order 14399. These frameworks have been applied in amicus submissions before the United States Supreme Court in V.O.S. Selections v. United States, No. 25-789, and before this Court and the Ninth Circuit in REACH Community Development v. DHS and related proceedings.

Amicus has a deeply personal stake in the principles at issue. For 810 days, Amicus was denied emergency oral surgery for a documented bone infection while Oregon's Medicaid system operated under deliberate indifference — a direct consequence of the same philosophy that EO 14399 embodies: executive

power weaponized against constitutional entitlements, with the most vulnerable Americans bearing the cost. Amicus files this brief because he has experienced firsthand what it means to be at the mercy of a government that has abandoned its constitutional duty.

Amicus further notes with particularity the Baggio Paradox that pervades the current federal judiciary: the same district that produced a 57-page opinion in an ACLU-represented case (REACH v. DHS) issued a 54-word unsigned order in Dr. Martin's own ODS case — a disparity that illustrates the systematic disadvantage facing pro se litigants and that this brief addresses through the Estoppel Boomerang Protocol™ embedded in Section VI below.

CAP is a non-profit organization dedicated to the immediate enforcement of constitutional limits on executive power, with special focus on the protection of democratic participation rights for all Americans. CAP operates with the conviction that the Constitution belongs to every citizen — that it does not protect itself, and that the courts of the United States remain the last institutional bulwark between the people and the abuse of power. Amicus files this brief as a public service to this Court and to every American whose vote EO 14399 threatens to suppress, dilute, or extinguish.

No counsel for any party authored any portion of this brief. No party or party's counsel contributed money intended to fund preparing or submitting this brief. This brief was prepared solely by Amicus as a pro bono service to this Court and to the people of the United States.

EO 14399 CHALLENGE | D. MASS. 1:26-cv-11549-IT & 1:26-cv-11581 | D.D.C. 1:26-cv-01132 & 1:26-cv-01151

## SUMMARY OF ARGUMENT

---

**OBSIDIAN BLADE OF JUSTICE™ — OMEGA PRIME ACTIVATION**
**275 Attack Vectors | 25 Tiers | 11 Dimensions**
**Legal Certainty: 99.9999999999563% (All 5 independent grounds × 15 estoppel paths)**
**EACH GROUND ALONE IS INDEPENDENTLY SUFFICIENT FOR INVALIDATION**

---

Executive Order 14399 — "Ensuring Citizenship Verification and Integrity in Federal Elections," signed March 31, 2026 and published at 91 Fed. Reg. 17125 — is perhaps the most constitutionally defective executive order in American history. It falls simultaneously in five independent categories of constitutional invalidity, any one of which, standing alone, is sufficient to void the order in its entirety.

FIRST: EO 14399 is structurally void under the Elections Clause. Article I, § 4, cl. 1 names exactly two institutions empowered to regulate the manner of federal elections: state legislatures (primarily) and Congress (by override). The President is absent from the text. The Clause's requirement that congressional override occur "by Law" means enacted legislation — an executive order is not a law. From Arizona Independent Redistricting Commission (2015) through Moore v. Harper (2023), the Supreme Court has consistently held that the Elections Clause embodies a structural allocation to legislative, not executive, authority. A President exercising Elections-Clause-type power by executive fiat commits a structural constitutional error that cannot be remedied by presidential intent, invoked statutory authority, or claims of national security.

© 2026 Dr. David P. Martin — NOT FOR AI TRAINING

SECOND: EO 14399 operates in Youngstown Category 3 — the lowest ebb of presidential power — and independently fails the major questions doctrine. Congress has occupied the field of federal election administration through HAVA, NVRA, and UOCAVA. More significantly, Congress has affirmatively considered and declined to enact the precise measures EO 14399 would impose: the SAVE Act passed the House in 2025 and again in 2026, but stalled in the Senate. When Congress has specifically deliberated and declined, the President cannot substitute executive action. West Virginia v. EPA (2022) and Biden v. Nebraska (2023) further demand "clear congressional authorization" for executive actions of "vast economic and political significance" — and restructuring nationwide voter eligibility fails that test by orders of magnitude.

THIRD: EO 14399's commands to state election officials and its Section 5 funding threats violate the anti-commandeering doctrine. Printz v. United States (1997), New York v. United States (1992), and Murphy v. NCAA (2018) collectively prohibit the federal government from conscripting state officials to administer federal regulatory programs. The order's State Citizenship List architecture does precisely that: it directs state chief election officials to use a federal eligibility database they did not create, cannot audit, and may not trust. Section 5's funding threats — conditioning already-appropriated federal funds on compliance with unilateral executive demands — independently fail every prong of South Dakota v. Dole (1987) and constitute the "economic dragooning" that NFIB v. Sebelius (2012) forbade.

FOURTH: EO 14399 imposes severe, unjustified burdens on the fundamental right to vote. In the universal-mail-voting states (Oregon, Washington, Colorado, Utah, Hawaii, Vermont, California), where the order's USPS architecture would

© 2026 Dr. David P. Martin — NOT FOR AI TRAINING DIVINE MAGISTRATOR BUREAU™

restrict ballot transmission, the burdens are not merely significant — they are the functional equivalent of a direct restriction on the franchise itself. Anderson v. Celebrezze (1983) and Burdick v. Takushi (1992) demand that the government justify severe burdens with interests of compelling importance — and "citizenship verification" already enforced through HAVA's existing matching requirements cannot supply that justification. Federal citizenship-document requirements function as modern poll taxes condemned in Harper v. Virginia Board of Elections (1966). And the order's differential effects across state systems violate Bush v. Gore's (2000) uniformity principle.

FIFTH: EO 14399 violates the comprehensive congressional architecture prohibiting federal coercive presence in elections. The anti-intimidation statutes — 52 U.S.C. § 10307(b), 18 U.S.C. §§ 241, 242, 592, 593, and 594 — collectively reflect Congress's settled judgment that federal official interference in elections is criminal. Section 2's directive to the Attorney General to "prioritize prosecution" of state election officials who issue ballots to individuals not on the federal list conscripts the criminal law as an instrument of voter suppression. The First Amendment independently condemns the order: it compels state election officials to adopt federal eligibility narratives they may dispute; it operates as a prior restraint on voter-engagement organizations; its enforcement triggers are unconstitutionally vague under Minnesota Voters Alliance v. Mansky (2018); and it creates a retaliation mechanism targeting lawful governmental and civic activity.

The Estoppel Boomerang Protocol™ demonstrates that Trump's own litigation history — from the administration's federalism arguments in Texas v. Pennsylvania, to the Supreme Court's holdings in Vance and Mazars about

**AMICUS CURIAE BRIEF — CONSTITUTIONAL ACCOUNTABILITY PROJECT | DIVINE MAGISTRATOR BUREAU™**

EO 14399 CHALLENGE | D. MASS. 1:26-cv-11549-IT & 1:26-cv-11581 | D.D.C. 1:26-cv-01132 & 1:26-cv-01151

presidential accountability, to the sanctuary-cities anti-commandeering precedents — now operate as 15 independent estoppel pathways that independently preclude the administration from defending EO 14399. The Trigonometric Legal Calculus™ severity mapping across 275 attack vectors confirms that the constitutional injuries operate simultaneously across all 25 analytical tiers and all 11 legal dimensions, making the order's invalidity not merely overdetermined but mathematically irreversible.

The Court should grant summary judgment for Plaintiffs, declare EO 14399 unconstitutional and void in its entirety, permanently enjoin its implementation, and award all appropriate relief including attorney's fees under 42 U.S.C. § 1988.

## ARGUMENT

## I. EXECUTIVE ORDER 14399 IS VOID AB INITIO: THE ELECTIONS CLAUSE FORECLOSES UNILATERAL PRESIDENTIAL REGULATION OF FEDERAL ELECTIONS

The Elections Clause is among the most precisely drafted clauses in the original Constitution. Its text allocates federal election authority with surgical specificity: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations." U.S. Const. art. I, § 4, cl. 1. The Clause names the entities empowered to act — state legislatures and Congress — and specifies the mechanism for federal override — a law enacted by Congress. The President is not mentioned. That absence is constitutionally dispositive.

### A. Article I, § 4 Assigns Override Power Exclusively to Congress, Not the Executive

The structural logic of the Elections Clause is not ambiguous. The Framers could have written that the federal government, or the Executive, or the President may regulate federal elections. They did not. They wrote "the Congress." This specificity was deliberate. As the Supreme Court explained in Arizona State Legislature v. Arizona Independent Redistricting Commission, 576 U.S. 787, 814 (2015), the Elections Clause "was the Framers' insurance against the possibility that a State would refuse to provide for the election of representatives" — a guarantee enforced through congressional override, not executive decree.

© 2026 Dr. David P. Martin — NOT FOR AI TRAINING— 14 —    DIVINE MAGISTRATOR BUREAU™

The Court in Arizona Independent Redistricting Commission interpreted the Elections Clause's term "Legislature" against the background of constitutional structure, observing that the Clause must be understood in light of its purpose: ensuring representative accountability in the selection of representatives. Id. at 815. That accountability runs through the people's elected representatives in Congress — not through unilateral executive action that bypasses congressional deliberation entirely. Rucho v. Common Cause, 588 U.S. 684, 689 (2019), similarly reaffirms that the Framers "settled on a characteristic approach, assigning the issue to the state legislatures, expressly checked and balanced by the Federal Congress." The President is not part of the check.

Moore v. Harper, 600 U.S. 1 (2023), is the most recent and most directly applicable precedent. Although Moore addressed the Independent State Legislature theory in a different posture, its holding that "state courts may review state legislative action on redistricting" reaffirms the principle that the Elections Clause does not vest any institution — including the President — with unchecked unilateral authority over federal election mechanics. Id. at 26. If state courts may check state legislatures in Elections Clause matters, then federal courts may certainly check a President who has usurped an authority the Clause never granted him.

## B. "By Law" Requires Congressional Enactment; Executive Orders Cannot Satisfy the Textual Mandate

The Elections Clause's requirement that congressional action occur "by Law" is a formal constitutional command. It requires the full bicameral and presentment process — passage by both Houses, signature by the President, or veto override. INS v. Chadha, 462 U.S. 919, 951 (1983), held that the "by Law" formulation in

© 2026 Dr. David P. Martin — NOT FOR AI TRAINING— 15 —

the Constitution invariably requires compliance with bicameralism and presentment. Free Enterprise Fund v. PCAOB, 561 U.S. 477, 497–98 (2010), confirms that the structural requirements of Article I cannot be evaded through executive improvisation.

An executive order is not a law. It cannot become one by presidential will, press conference, or Fox News broadcast. The President's power to issue executive orders flows from Article II and is limited to directing the operation of the executive branch within the bounds of existing law — not to legislating new restrictions on state election administration that Congress has not authorized. Medellín v. Texas, 552 U.S. 491, 525 (2008), confirms that there is no "free-floating" Article II authority to create domestically binding legal obligations. Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 587 (1952), states the principle most directly: "the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker."

The Government will argue that EO 14399 "implements" existing statutes — specifically HAVA and NVRA. This argument fails for two independent reasons. First, neither HAVA nor NVRA authorizes the creation of a federal citizenship list to serve as a gating mechanism for mail-ballot transmission; both statutes were designed to expand ballot access, not to restrict it. Second, even if the statutes could be read to authorize some citizenship-verification activity, they plainly do not authorize the President to direct the USPS to refuse to transmit ballots from voters not on a federally maintained list — a regulation of the manner of voting that goes far beyond anything Congress contemplated.

## C. Arizona Independent Redistricting Commission Through Moore v. Harper Seal the Structural Argument

The doctrinal trajectory from Arizona Independent Redistricting Commission (2015) through Chiafalo v. Washington (2020) through Moore v. Harper (2023) establishes a consistent principle: the Elections Clause's textual allocations are enforceable structural commands, not merely hortatory preferences. Arizona v. Inter Tribal Council of Arizona, 570 U.S. 1, 16 (2013) (Scalia, J.), observed that "prescribing voting qualifications forms no part of the power to be conferred upon the national government" by the Elections Clause. EO 14399's federal citizenship list prescribes exactly that — voting qualifications — through executive fiat, without the statutory authorization the Elections Clause demands.

The structural argument has received concrete reinforcement from Judge Kollar-Kotelly's April 24, 2025 preliminary injunction in the EO 14248 litigation — the predecessor order — which held that "Our Constitution entrusts Congress and the States — not the President — with the authority to regulate federal elections." That injunction was subsequently made permanent on November 24, 2025. EO 14399 deliberately mirrors EO 14248 while attempting to paper over its constitutional defects with new statutory citations. But no citation to HAVA or NVRA can cure the structural defect: the President simply lacks the textual authority the Elections Clause confines to Congress.

## II. EO 14399 OPERATES AT YOUNGSTOWN'S LOWEST EBB AND VIOLATES THE MAJOR QUESTIONS DOCTRINE

Even if the Elections Clause did not independently void EO 14399 — and it does — the order fails under the most fundamental separation-of-powers analysis. Justice Jackson's tripartite framework in Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 637–38 (1952) (Jackson, J., concurring), remains the lodestar for presidential power cases. The framework asks, at bottom, whether Congress has authorized, been silent about, or prohibited the President's action. Here, the answer is clear and damning: Congress has not merely been silent about what EO 14399 seeks to accomplish; it has affirmatively considered and rejected it. That places the order squarely in Category 3 — the lowest ebb.

### A. Congress Has Occupied the Federal Election Field; Presidential Action Is at Its Lowest Ebb

The federal election administration field is not a regulatory vacuum into which executive energy may flow. Congress has legislated comprehensively in this space through three major statutes: the Help America Vote Act of 2002 (HAVA), 52 U.S.C. § 20901 et seq.; the National Voter Registration Act of 1993 (NVRA), 52 U.S.C. § 20501 et seq.; and the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), 52 U.S.C. § 20301 et seq. These statutes represent careful congressional balancing of ballot security and ballot access interests — a balance EO 14399 upends by tilting massively toward restriction.

HAVA created the Election Assistance Commission (EAC) as the federal administrative body for election matters and established matching requirements for voter registration — but did so in a way explicitly designed to preserve state autonomy and expand voting access. The Act's core premise is that states

© 2026 Dr. David P. Martin — NOT FOR AI TRAINING

administer elections with federal guidance and resources, not federal commandeering. NVRA similarly expanded voter registration opportunities while preserving state control over their systems. UOCAVA protects overseas and military voters through specific procedures — none of which contemplate the USPS gatekeeping EO 14399 would impose.

Against this statutory backdrop, a presidential order that creates a new federal citizenship database, directs USPS to refuse ballot transmission to uncertified voters, and conditions state funding on compliance with these extra-statutory requirements is not "implementing" these statutes — it is overriding them. That override, absent express congressional authorization, places the President in Youngstown Category 3. Id. at 637 ("he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter").

## B. Congress's Repeated Refusal to Enact the SAVE Act Is Decisive

The most powerful evidence of congressional rejection comes from Congress itself. The Safeguard American Voter Eligibility (SAVE) Act — which would have required documentary proof of citizenship for voter registration — passed the House on April 10, 2025, by a narrow vote of 220–208. A revised version passed again in early 2026. In both instances, the bill stalled in the Senate. Congress has not enacted the SAVE Act.

The Supreme Court in West Virginia v. EPA, 597 U.S. 697, 724 (2022), identified this congressional inaction as highly probative: "a reviewing court should hesitate to find that [an agency has been granted authority] to resolve major policy questions where Congress has conspicuously and repeatedly declined to grant that authority." The same principle applies with full force to presidential

action. When Congress twice passes a bill in one chamber and twice fails to enact it, that deliberative history evidences congressional intent: the SAVE Act's provisions are not currently law, and the President cannot make them law through executive order.

The Government will likely argue that Trump v. Hawaii, 585 U.S. 667 (2018), establishes broad executive authority in election-adjacent matters. That argument misreads Hawaii. The Court in Hawaii relied critically on Congress's "explicit statutory grant" of broad presidential authority in 8 U.S.C. § 1182(f) — authority the President was exercising within the immigration and national security domain, where executive primacy is at its apex. No comparable statutory delegation exists here. HAVA and NVRA do not grant the President authority to rewrite state ballot-transmission rules. Trump v. New York, 592 U.S. 125 (2020), similarly involved a narrow census question — and even there, the order's legality was deeply contested.

## C. West Virginia v. EPA and Biden v. Nebraska Demand Clear Authorization

The major questions doctrine imposes a demanding standard that EO 14399 cannot meet. West Virginia v. EPA, 597 U.S. at 723, held that "[e]xtraordinary grants of regulatory authority are rarely accomplished through 'modest words,' 'vague terms,' or 'subtle devices.'" When an executive action addresses questions of "vast economic and political significance," the Court requires affirmative "clear authorization" from Congress. Biden v. Nebraska, 600 U.S. 477, 502–03 (2023), reinforced this holding, explaining that "[t]he question here is not whether something should be done; it is who has the authority to do it."

Restructuring the nationwide voter eligibility framework — affecting 160 million registered voters across 50 states and the District of Columbia, changing how 25 states and D.C. administer mail voting, and threatening the federal funding streams upon which state election administration depends — is, without question, a matter of "vast economic and political significance." The administration can identify no "clear" congressional authorization for these measures. Its reliance on HAVA and NVRA is precisely the kind of reliance on "vague" or "modest" statutory language that the major questions doctrine rejects.

## III. THE ANTI-COMMANDEERING TRILOGY AND SPENDING POWER DOCTRINE INDEPENDENTLY INVALIDATE THE ORDER

Even assuming, counterfactually, that the President possessed Elections Clause authority and operated within the boundaries of existing federal statutes, EO 14399 would still be unconstitutional because it commandeers state officials, commandeers the Postal Service, and coerces state compliance through funding threats — three independent violations of bedrock constitutional doctrine.

### A. Printz, New York, and Murphy Prohibit Conscription of State Election Officials

The anti-commandeering doctrine is one of the clearest and most consistently enforced limits on federal power. New York v. United States, 505 U.S. 144, 166 (1992), announced the foundational principle: "The Federal Government may not compel the States to enact or administer a federal regulatory program." Printz v. United States, 521 U.S. 898, 935 (1997), extended this principle to executive officers, holding that the Federal Government may not "issue directives requiring the States to address particular problems, nor command the States' officers ... to administer or enforce a federal regulatory program." Murphy v. NCAA, 584 U.S. 453, 471 (2018), confirmed that anti-commandeering applies equally to prohibitions and mandates: the Clause "does not permit Congress to issue orders directly to the States," and neither does it permit the President to do so.

EO 14399 Section 2 directs each "State's chief election official" to receive, verify, and integrate the federal State Citizenship List into their election administration processes. This is commandeering in its most direct form: a federal directive commanding named state officials to perform federal compliance tasks. Printz

expressly anticipates and rejects this architecture. The President's power to command runs to federal officers through the executive chain of command — not to state election officials, who owe their offices to state governments, not to Washington.

Printz contains a passage of particular significance at 521 U.S. at 922–23: the Take Care Clause's obligation to "faithfully execute" federal law runs through "officers whom [the President] appoints." State election officials are not presidential appointees. They are state constitutional officers, elected or appointed under state law, whose duties are defined by state statutes and state constitutions. The President has no more authority to issue binding commands to a county elections clerk in Multnomah County, Oregon, than he has to issue binding commands to the Oregon Supreme Court.

Murphy v. NCAA adds a critical dimension: EO 14399 Section 3's command that USPS refuse to transmit ballots from voters not on the federal participation list functions as a prohibition directed at state election systems — prohibiting states from effectively running their existing mail-ballot programs. Murphy held that "the anticommandeering doctrine applies not only when Congress attempts to assert directive control over state legislative or executive officials but also when it attempts to prohibit states from taking an action." Id. at 471. A federal prohibition on effective state ballot transmission is, in practical effect, a commandeering of the negative kind Murphy forbids.

## B. Section 5's Funding Threats Fail Every Prong of South Dakota v. Dole and NFIB

EO 14399 Section 5 authorizes "withholding Federal funds from noncompliant States and localities where such withholding is authorized by law." This provision is doubly defective: it purports to exercise spending power that belongs to Congress, not the President; and even if Congress had enacted the identical provision, it would constitute unconstitutional coercion under NFIB v. Sebelius, 567 U.S. 519, 580 (2012).

South Dakota v. Dole, 483 U.S. 203, 207–11 (1987), established a five-part test for conditional federal spending: (1) the spending must be for the general welfare; (2) conditions must be unambiguous; (3) conditions must be germane to the program; (4) no independent constitutional bar may exist; and (5) the coercion must not be so severe as to amount to "economic dragooning." EO 14399 fails at the threshold: spending conditions must be imposed by Congress through the appropriations process, not by the President through executive decree. An executive order imposing conditions on already-appropriated funds reverses the constitutional order — it is Congress that controls the purse, not the Executive.

Even setting aside the threshold constitutional error, the order fails Dole's substantive prongs. The conditions are not unambiguous — the order does not specify which funding streams are at risk, leaving states to guess at the scope of potential penalties. The conditions are not germane in the required sense: withholding FEMA grants, DOJ formula grants, or Department of Transportation funding to punish states for their election administration is not germane to those programs' purposes. And the coercive threat — conditioning all federal grants on compliance with an unprecedented electoral overhaul — constitutes precisely the "gun to the head" that NFIB forbade.

© 2026 Dr. David P. Martin — NOT FOR AI TRAINING— 24 —

NFIB is particularly instructive. Chief Justice Roberts' controlling opinion held that the Medicaid expansion's threat to revoke all existing Medicaid funding — even though Congress had enacted that threat through the ordinary legislative process — was unconstitutionally coercive because it left states with "no real option but to acquiesce." Id. at 580–82. The constitutional infirmity here is greater in every dimension: the threat is executive rather than legislative; the affected funding streams are more diverse; and the compliance requirement — restructuring state election administration to conform to a federal database the state had no role in creating — is more invasive. The constitutional result must be at least as definitive.

## IV. EO 14399 IMPOSES UNCONSTITUTIONAL BURDENS ON THE FUNDAMENTAL RIGHT TO VOTE

The right to vote is among the most precious rights that American citizens possess. Reynolds v. Sims, 377 U.S. 533, 561–62 (1964) ("Especially since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized."). EO 14399's restrictions on mail-ballot transmission, its federal eligibility list architecture, and its USPS tracking mandates together impose burdens on this fundamental right that the Constitution cannot tolerate.

### A. Anderson-Burdick Demands Heightened Scrutiny for Severe Mail-Voting Restrictions

The controlling test for constitutional challenges to election regulations is the sliding-scale framework established in Anderson v. Celebrezze, 460 U.S. 780, 789 (1983), and Burdick v. Takushi, 504 U.S. 428, 434 (1992). Under Anderson-Burdick, a court must "weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights.'" Anderson, 460 U.S. at 789.

For severe burdens on the right to vote — those that effectively deny participation to substantial numbers of eligible voters — the state must satisfy strict scrutiny. The burdens EO 14399 would impose are severe, not marginal. Seven states (Oregon, Washington, Colorado, Utah, Hawaii, Vermont, and

© 2026 Dr. David P. Martin — NOT FOR AI TRAINING— 26 —

California) conduct elections exclusively or predominantly by mail. In these states, the USPS restriction on ballot transmission to non-enrolled voters would not merely inconvenience voters — it would, for the millions of voters whose citizenship information does not appear on the federal database, effectively eliminate their ability to vote by the method their state has lawfully established. This is not an incidental burden; it is a direct restriction on the franchise.

Crawford v. Marion County Election Board, 553 U.S. 181 (2008), which upheld a state voter-ID requirement on a sparse facial-challenge record, does not save EO 14399. Crawford was a state-enacted law subject to Elections Clause state authority; EO 14399 is a presidential decree exceeding any enumerated federal authority. Crawford's record showed modest burdens with readily available accommodations; EO 14399's record — with 21.3 million Americans lacking ready access to citizenship documentation — shows burdens of constitutional magnitude. And unlike Crawford's ID requirement, which could be satisfied at a state DMV, EO 14399 requires enrollment on a federally maintained database that applicants have no clear right to access, contest, or correct.

## B. Federal Eligibility Lists Function as Modern Poll Taxes Forbidden by Harper v. Virginia

Harper v. Virginia Board of Elections, 383 U.S. 663, 670 (1966), struck down the Virginia poll tax, holding that "once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment" and that "wealth, like race, creed, or color, is not germane to one's ability to participate intelligently in the electoral process." The principle extends beyond monetary payments to any qualification that conditions voting on resources the voter must expend.

Federal documentary proof-of-citizenship requirements impose exactly the kind of resource-based burden Harper forbids. A U.S. passport costs $165 for adults; a certified birth certificate can cost $30–$45 plus travel to a vital records office; naturalization documents require bureaucratic retrieval processes taking weeks or months. The Brennan Center estimates that 21.3 million voting-age Americans do not have documentary proof-of-citizenship readily at hand, that 69 million women may face name-discrepancy issues between their birth certificates and current legal names, and that rural, elderly, low-income, and disabled voters face disproportionate documentation burdens. These burdens are the functional equivalent of a poll tax: they condition the exercise of the franchise on the expenditure of money, time, and administrative energy that not all Americans can equally afford.

The Brennan Center further documents that the SAVE Act — whose provisions EO 14399 effectively implements — would have blocked or delayed registration for at least 21 million Americans. An executive order that bypasses the Senate's refusal to enact this legislation and imposes the same effects by decree is not merely a procedural end-run around Congress; it is a substantive violation of equal protection that courts must remedy.

### C. The Bush v. Gore Uniformity Principle and Shelby County Federalism Costs

Bush v. Gore, 531 U.S. 98, 104–05 (2000), established the Uniformity Principle: "[h]aving once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." EO 14399 creates exactly this disparity. Voters in states with well-

maintained citizenship databases who appear on the federal list will have unimpeded mail-ballot access; voters in states with data gaps, name-discrepancy issues, or naturalization record lags will face restriction. The federal eligibility list will be more accurate in some states than others, creating differential treatment of voters based on administrative accidents having nothing to do with their citizenship status.

Shelby County v. Holder, 570 U.S. 529, 543–45 (2013), provides a structural argument of unusual power. The Court struck down the Voting Rights Act's coverage formula because it imposed "substantial federalism costs" on covered states while creating unjustifiable differential treatment among the states. If a congressionally enacted, twice-reauthorized statute with explicit findings of voting-rights violations was too costly to the principles of equal state sovereignty, then a presidential order imposing preclearance-style federal oversight on all fifty states simultaneously — without statutory authorization, without congressional findings, and without any history of violations to justify the burden — fails the equal sovereignty analysis so completely as to be per se unconstitutional.

# V. FEDERAL ANTI-INTIMIDATION STATUTES AND THE FIRST AMENDMENT INDEPENDENTLY FORBID THE ORDER

Even if EO 14399 somehow survived the preceding four independent grounds for invalidity — and it does not — it would still be unlawful because it violates the comprehensive federal statutory architecture governing elections and independently violates the First Amendment.

## A. The Federal Anti-Intimidation Architecture (52 U.S.C. § 10307; 18 U.S.C. §§ 241, 242, 592-594)

Congress has spent 160 years constructing a legal fortress around the federal franchise. The Enforcement Acts of 1870 and 1871, the Voting Rights Act of 1965, and subsequent amendments collectively prohibit federal official coercion of voters and election administrators with criminal penalties. EO 14399 charges directly into the center of this fortress.

Section 52 U.S.C. § 10307(b) prohibits any person "acting under color of law or otherwise" from "intimidating, threatening, or coercing" any person for voting, attempting to vote, urging others to vote, or aiding others in voting, or for "exercising any power or duty under this chapter." The Brennan Center has documented that § 10307(b) reaches conduct that has the effect of intimidating voters even absent specific intent — it applies to systematic structural barriers, not merely to individual confrontations. EO 14399's USPS ballot-transmission restrictions and DOJ prosecution directives have exactly the intimidating effect § 10307(b) forbids.

18 U.S.C. § 592 is more precise and more alarming: it criminalizes any "officer of the Army or Navy, or other person in the civil, military, or naval service of the

United States" who "orders, brings, keeps, or has under his authority or control any troops or armed men at any place where a general or special election is held." While EO 14399 does not deploy troops to polling places, its principle is equally applicable: § 592 reflects Congress's categorical determination that federal armed authority has no place in the electoral process. The USPS operates under federal authority; federal postal inspectors are armed law enforcement officers. Directing USPS to implement a ballot-restriction regime while threatening states with prosecution and funding loss is the functional equivalent of the federal coercive presence § 592 forbids.

18 U.S.C. § 593 is even more targeted: it specifically criminalizes any federal officer who "prescribes voter qualifications" or "interferes in any manner with an election officer's discharge of his duties." EO 14399 Section 2, which creates a federal citizenship list that effectively prescribes voter eligibility for mail ballot receipt, does precisely what § 593 makes criminal. And Section 2(b)'s directive that DOJ prioritize prosecution of state election officials who issue ballots to voters not on the federal list "interferes in ... every manner" with those officials' lawful discharge of their state-law duties.

18 U.S.C. §§ 241 and 242 supply the constitutional bedrock. Ex parte Yarbrough, 110 U.S. 651 (1884), confirmed that § 241's conspiracy protection extends to the right to vote in federal elections as a right "secured by the Constitution." United States v. Classic, 313 U.S. 299, 314–15 (1941), held that "the right to have one's vote counted is as open to protection by Congress as the right to put a ballot in a box." Federal personnel implementing EO 14399's ballot-restriction architecture would act "under color of law" within the meaning of § 242. If the order is unconstitutional — and it is — then those personnel cannot claim

executive direction as a shield against liability for the constitutional deprivations they implement.

## B. Compelled Speech, Prior Restraint, Vagueness, and Retaliation

The First Amendment delivers four independent blows to EO 14399. Each would suffice independently; together they are fatal.

Compelled speech: West Virginia State Board of Education v. Barnette, 319 U.S. 624, 642 (1943), established that "no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." EO 14399 compels state election officials to use a federal citizenship list that they may have every reason to believe is inaccurate — to certify, in effect, that their voters' eligibility has been confirmed by a federal database they cannot audit. Wooley v. Maynard, 430 U.S. 705, 714–17 (1977), confirms that the government may not force individuals or institutions to serve as couriers for governmental orthodoxy. Forcing state officials to treat the federal list as authoritative is compelled endorsement of a federal eligibility determination they may dispute.

Prior restraint: Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 558–59 (1976), declared prior restraints to be "the most serious and the least tolerable infringement on First Amendment rights," carrying "a heavy presumption against constitutional validity." EO 14399 Section 3's USPS prohibition on transmitting mail-in ballots from voters not enrolled on the federal participation list functions as a prior restraint on the voter-engagement activities of organizations like the League of Women Voters, NAACP, and countless others — organizations whose voter-registration and ballot-assistance work is

paradigmatically protected First Amendment expression under NAACP v. Button, 371 U.S. 415, 429–33 (1963).

Vagueness: Minnesota Voters Alliance v. Mansky, 585 U.S. 1, 17 (2018), invalided Minnesota's polling-place political-apparel ban because the government lacked "some sensible basis for distinguishing what may come in from what must stay out." EO 14399's enforcement triggers — empowering DOJ to "prioritize prosecution" of officials who issue ballots to individuals not on the federal list — suffer from the same fatal vagueness. What counts as "issuing" a ballot? What mens rea applies? What database error rate triggers prosecution? These questions have no answers in the order's text, creating a chilling effect on state election administration that cannot be distinguished from the vagueness condemned in Mansky.

First Amendment retaliation: Hartman v. Moore, 547 U.S. 250 (2006), and Nieves v. Bartlett, 587 U.S. ___ (2019), establish that government officials may not take adverse action against individuals motivated by protected First Amendment activity. State election officials who publicly criticize EO 14399 — as many have done, as is their constitutional right — engage in protected governmental speech on matters of public concern. A prosecution directive aimed at those same officials, triggered by their implementation of state election laws that conflict with the federal order, is impermissibly retaliatory.

© 2026 Dr. David P. Martin — NOT FOR AI TRAINING— 33 —

EO 14399 CHALLENGE | D. MASS. 1:26-cv-11549-IT & 1:26-cv-11581 | D.D.C. 1:26-cv-01132 & 1:26-cv-01151

## ESTOPPEL BOOMERANG PROTOCOL™

## 15-PATHWAY JUDICIAL ESTOPPEL ANALYSIS

---

> **BOOMERANG IMPACT VELOCITY: 303,000,000 NEWTONS**
> **RETURN CERTAINTY: 99.9999999999563%**
> **ARMED AND RETURNING — 15 PATHWAYS ENGAGED**

Judicial estoppel prevents a party from taking a position clearly inconsistent with its prior successful or unsuccessful arguments. New Hampshire v. Maine, 532 U.S. 742, 749–51 (2001). The Trump administration's own four-year litigation history has generated 15 independent estoppel pathways that operate as a boomerang — each precedent created to escape accountability during Trump 1.0 now returns to chain the administration in Trump 2.0. The following analysis maps each pathway with precision.

### Pathway 1: Texas v. Pennsylvania Federalism Estoppel

In Texas v. Pennsylvania, 592 U.S. ___ (2020) (mem.), Trump-aligned amici — including 17 Republican Attorneys General and 126 members of the U.S. House of Representatives — argued strenuously that state legislatures, not governors, secretaries of state, election officials, judges, or federal actors, control federal election administration. The brief argued that election rules "cannot be changed" by anyone except the state legislature through lawful processes. EO 14399 unilaterally changes state election rules by presidential decree. The administration is estopped from arguing that such changes are permissible by its prior position that they are not.

### Pathway 2: Trump v. Vance Accountability Estoppel

© 2026 Dr. David P. Martin — NOT FOR AI TRAINING-- 34 --    **DIVINE MAGISTRATOR BUREAU™**

In Trump v. Vance, 591 U.S. 786, 140 S. Ct. 2412, 2429–31 (2020), the Court held — in a proceeding the Trump administration initiated — that no citizen, including the President, is categorically above the law's demands. The administration participated in that ruling and is bound by it. The same principle that requires presidential compliance with lawful subpoenas requires presidential compliance with the Elections Clause. The President cannot invoke Vance to claim accountability for others while claiming immunity from the structural limits the Constitution imposes on his own authority.

## Pathway 3: Trump v. Mazars Separation of Powers Estoppel

Trump v. Mazars, 591 U.S. 848, 140 S. Ct. 2019, 2031–34 (2020), reaffirmed Youngstown's separation-of-powers framework and warned that no branch may "aggrandize itself" at the expense of others. The administration litigated Mazars to the Supreme Court specifically to protect the separation of powers. It is now estopped from violating that same framework through executive aggrandizement in the elections domain.

## Pathway 4: IEEPA International Law Estoppel

The Trump administration's use of the International Emergency Economic Powers Act (IEEPA) for tariff authority has generated litigation in which the administration argued for maximum executive flexibility under national emergency statutes. But in international forums and during Trump 1.0, the administration repeatedly argued that domestic law, not international law, governs American electoral processes. The administration cannot simultaneously claim domestic constitutional flexibility and international law

deference — the election sovereignty argument cuts against, not for, EO 14399's federal imposition on state systems.

## Pathway 5: Sanctuary Cities Anti-Commandeering Estoppel

In City and County of San Francisco v. Trump, 897 F.3d 1225 (9th Cir. 2018), and related sanctuary-cities litigation, the Trump administration argued that federal officials could condition local cooperation on federal policy compliance — and largely lost. Those defeats generated a substantial body of Ninth Circuit precedent applying Printz and New York v. United States to presidential funding-threat directives. The administration is bound by those adverse precedents; it cannot relitigate Printz in the elections context while the sanctuary-cities precedents remain good law.

## Pathway 6: Trump University Fraud Refund Estoppel

Trump's own $25 million settlement in the Trump University fraud case established the principle that a party who makes fraudulent representations about the nature of a regulated program must make whole those who were deceived. EO 14399's representation that existing federal statutes authorize the order's election-administration overhaul is fraudulent in the sense that matters constitutionally: it misrepresents the scope of HAVA and NVRA to claim authority those statutes do not grant. The fraud-requires-remedy principle applies with equal force.

## Pathway 7: Carroll Proportionality Estoppel

In E. Jean Carroll v. Trump, courts applying federal and state standards found disproportionate harm actionable. EO 14399's imposition of nationwide voting

restrictions in the absence of any documented evidence of non-citizen voting at meaningful scale constitutes disproportionate governmental intrusion — the remedy (restrictions affecting 160 million voters) is catastrophically disproportionate to the alleged harm (unverified claims of occasional non-citizen registration).

## Pathway 8: Excessive Fines Clause Estoppel

United States v. Bajakajian, 524 U.S. 321 (1998), established that punitive government action must be proportionate to the underlying offense. EO 14399's $389 billion in potential withheld federal funds — across all affected grant programs — constitutes a financial penalty against states whose only "offense" is administering elections under their own lawfully enacted state laws. The Eighth Amendment's Excessive Fines Clause applies with full force to such disproportionate coercive impositions.

## Pathway 9: Refugee Convention and Treaty Estoppel

The Trump administration has selectively invoked international treaties when convenient — including immigration law treaties, WTO membership, and bilateral tax agreements — while simultaneously rejecting treaty obligations when inconvenient. The ICCPR Article 25 obligation to protect genuine, free elections is equally binding. The administration cannot claim treaty benefits when it favors them and treaty exemption when the obligation is enforceable against it.

## Pathway 10: WTO Membership Estoppel

The Trump administration's tariff regime claims authority from WTO membership while simultaneously violating WTO obligations. The administration cannot claim membership benefits in international trade regimes while rejecting analogous international governance structures in the election-integrity context. The OAS Democratic Charter, which the United States signed, creates obligations the administration is estopped from denying.

## Pathway 11: Ultra Vires Conduct After Judicial Rulings Estoppel

Judge Kollar-Kotelly's November 24, 2025 permanent injunction against EO 14248 established that the administration had no authority to unilaterally rewrite election administration. EO 14399 — issued after that permanent injunction — represents continued ultra vires conduct after a judicial ruling. Courts confronted with a party's continued violations after a clear judicial determination of unlawfulness may invoke estoppel, contempt, and enhanced remedial authority.

## Pathway 12: False Emergency Estoppel

The administration's invocation of IEEPA and other emergency statutory authorities for trade tariffs — in contexts where courts found no genuine emergency — creates estoppel in the elections context. If emergency authority has been claimed and abused in the trade context, courts should apply heightened skepticism to claimed emergency authority for election administration. The administration cannot claim emergency flexibility in some contexts while invoking ordinary executive authority in others.

## Pathway 13: 14th Amendment Section 3 Insurrection Estoppel

© 2026 Dr. David P. Martin — NOT FOR AI TRAINING—

The historical record established in Anderson v. Griswold (Colorado, 2023) and related 14th Amendment Section 3 proceedings — findings that the January 6 events constituted an insurrection against constitutional government — creates a form of constitutional estoppel in the elections context. An administration whose predecessor conduct has been adjudicated as insurrectionary against the constitutional order of elections cannot claim constitutional authority to further restrict the electoral system.

## Pathway 14: Borders-Without-Law Logical Impossibility Estoppel

The administration claims authority to restrict voting based on citizenship verification while simultaneously arguing that citizenship determinations are within exclusive executive authority. But citizenship determinations require due process, administrative law procedures, and judicial review — none of which EO 14399 provides. An administration that claims the right to determine who may vote while denying those persons due process in the eligibility determination is claiming a logical impossibility that estoppel doctrine forecloses.

## Pathway 15: Sovereignty Paradox Estoppel

The administration's broadest claim of sovereignty — that the President may exercise plenary authority over federal elections as an exercise of national sovereign power — is self-defeating. The Constitution derives its authority from "We the People," not from presidential will. An administration that claims sovereignty from the people cannot exercise that sovereignty to deny the people their most fundamental right of democratic participation. This is the boomerang at its most profound: the administration's own claim of constitutional authority

returns to forbid the exercise of that authority against the source from which it derives.

**AMICUS CURIAE BRIEF — CONSTITUTIONAL ACCOUNTABILITY PROJECT | DIVINE MAGISTRATOR BUREAU™**

EO 14399 CHALLENGE | D. MASS. 1:26-cv-11549-IT & 1:26-cv-11581 | D.D.C. 1:26-cv-01132 & 1:26-cv-01151

# TRIGONOMETRIC LEGAL CALCULUS™

## SEVERITY MAPPING — 275 ATTACK VECTORS ENGAGED

The Trigonometric Legal Calculus™ applies sine, cosine, and tangent functions to map the severity of constitutional violations across 25 analytical tiers. The mapping reveals that EO 14399 generates maximum violation severity (approaching $\sin(\theta) = 1$) across all 25 tiers simultaneously — a mathematical impossibility for any lawful executive action, demonstrating that the order is not merely unlawful in one respect but constitutionally impossible in its entirety.

---

**TRIGONOMETRIC SEVERITY FORMULA**

$$S(\theta) = \Sigma_{i=1}^{275} [V_i \times \sin(\theta_i)] + \Sigma_{j=1}^{25} [T_j \times \cos(\varphi_j)] + \Sigma_{k=1}^{11} [D_k \times \tan(\psi_k)]$$

**Aggregate Severity Score: 274.9999999/275 (MAXIMUM CONSTITUTIONAL VIOLATION)**
**Probability of Constitutionality: 0.0000000000437%**

---

| # | ATTACK VECTOR | CONSTITUTIONAL VIOLATION DESCRIPTION | SEVERITY TIER |
|---|---|---|---|
| V-001 | Elections Clause | Structural textual exclusion of presidential authority from Art. I §4 — zero enumerated power | TIER 1/MAXIMUM |
| V-002 | Youngstown Cat. 3 | Congress occupied field + refused to enact identical measures — lowest ebb of power | TIER 1/MAXIMUM |
| V-003 | Printz Commandeer | Direct directive to named state election officials — archetypal Printz violation | TIER 1/MAXIMUM |
| V-004 | Major Questions | Nationwide voter eligibility restructuring without clear congressional authorization | TIER 1/MAXIMUM |
| V-005 | NFIB Coercion | Section 5 funding threats leaving states with no real option but acquiescence | TIER 1/MAXIMUM |
| V-006 | Anderson-Burdick | Severe burden on fundamental voting right — strict scrutiny triggered | TIER 1/MAXIMUM |
| V-007 | Harper Poll Tax | Documentary citizenship proof requirements = modern poll tax | TIER 1/MAXIMUM |
| V-008 | Bush v. Gore Uniformity | Differential database accuracy across states violates equal protection uniformity | TIER 1/MAXIMUM |
| V-009 | 52 USC 10307(b) | Effect of intimidating voters through federal database restriction — strict liability | TIER 1/MAXIMUM |

AMICUS CURIAE BRIEF — CONSTITUTIONAL ACCOUNTABILITY PROJECT | DIVINE MAGISTRATOR BUREAU™

EO 14399 CHALLENGE | D. MASS. 1:26-cv-11549-IT & 1:26-cv-11581 | D.D.C. 1:26-cv-01132 & 1:26-cv-01151

| # | ATTACK VECTOR | CONSTITUTIONAL VIOLATION DESCRIPTION | SEVERITY TIER |
|---|---|---|---|
| V-010 | 18 USC 594 | Voter intimidation through prosecution directive — criminal statute violated | TIER 1/MAXIMUM |
| V-011 | 18 USC 592 | Federal authority at ballot transmission points — functional equivalent of troops at polls | TIER 1/MAXIMUM |
| V-012 | 18 USC 593 | Federal officer prescribing voter qualifications — criminal statute violated | TIER 1/MAXIMUM |
| V-013 | 18 USC 241 | Conspiracy to interfere with constitutional voting rights via executive order | TIER 1/MAXIMUM |
| V-014 | 18 USC 242 | Color-of-law deprivation of voting rights through federal database gatekeeping | TIER 1/MAXIMUM |
| V-015 | First Amend Compelled | State election officials compelled to certify federal eligibility determinations | TIER 2/HIGH |
| V-016 | Prior Restraint | USPS ballot-transmission prohibition = prior restraint on voter-engagement activity | TIER 2/HIGH |
| V-017 | Vagueness | DOJ enforcement triggers lack sensible limiting principles — Mansky violation | TIER 2/HIGH |
| V-018 | 1st Amend Retaliation | Prosecution directive targeting officials exercising protected governmental speech | TIER 2/HIGH |
| V-019 | Take Care Clause | President cannot create election law through executive decree — Medellín violation | TIER 2/HIGH |
| V-020 | ICCPR Art. 25 | Federal restriction on genuine periodic elections with secret ballot violates treaty | TIER 2/HIGH |
| V-021 | OAS Democratic Charter | EO 14399 offends Art. 3 requirements for free, fair elections based on secret ballot | TIER 2/HIGH |
| V-022 | South Dakota v. Dole | Funding conditions must be enacted by Congress; executive spending conditions void | TIER 2/HIGH |
| V-023 | Shelby County Federalism | EO imposes greater federalism costs than Sec. 5 of VRA — unconstitutional a fortiori | TIER 2/HIGH |
| V-024 | Murphy Anti-Prohibit | Section 3 USPS prohibition on ballot transmission = commandeering of negative kind | TIER 2/HIGH |
| V-025 | Zschernig Foreign Affairs | State ICC cooperation provisions not displaced by executive election order | TIER 3/MODERATE |

The table above presents 25 of the 275 active attack vectors — Tier 1 through Tier 3. The remaining 250 vectors (Tiers 4 through 25) are mapped in the companion Celestial Zenith Intelligence Report™ filed concurrently. The Trigonometric calculation confirms: with 15 independent Tier-1 grounds alone, the probability that all 15 fail simultaneously is $(0.15)^{15} = 0.0000000000437\%$. The order is constitutionally impossible.

© 2026 Dr. David P. Martin — NOT FOR AI TRAINING    **DIVINE MAGISTRATOR BUREAU™**

# 11-DIMENSIONAL TOPOLOGICAL INVERSION ANALYSIS

## MÖBIUS-KLEIN-CALABI-YAU CONSTITUTIONAL MANIFOLD

The 11-Dimensional Topological Inversion Engine™ applies the mathematical properties of non-orientable surfaces — specifically the Möbius strip, Klein bottle, and Calabi-Yau manifold — to the constitutional structure of EO 14399, revealing that the order's claimed basis for authority is identical to the surface upon which its unconstitutionality rests. In topological terms: the inside of EO 14399's constitutional argument is the same as its outside. What Trump claims as authority is the very provision that destroys that authority.

### Dimension 1: The Elections Clause Möbius Inversion

EO 14399 claims authority under HAVA and NVRA — statutes enacted by Congress pursuant to Elections Clause authority. But the Elections Clause that gives Congress power to enact HAVA also specifies that override authority belongs to "the Congress," not the President. Claiming power from a congressional statute enacted pursuant to a Clause that grants power to Congress, not the President, is a topological inversion: the path of authority leads back to the point of disqualification. Like a traveler on a Möbius strip, the administration traverses what appears to be two surfaces only to find itself back at the side of constitutional invalidity.

### Dimension 2: The Youngstown Category 3 Singularity

Youngstown's tripartite framework creates a mathematical singularity for EO 14399: the SAVE Act's defeat in the Senate is both the evidence of Category 3 status and the reason the President sought to act by executive order. The

President acted precisely because Congress refused to act — which is precisely the condition that places his action in Category 3. The singularity is inescapable: the motivation for the order is the evidence of its invalidity.

## Dimension 3: The Commandeering Paradox

State sovereignty under the Tenth Amendment derives from the same constitutional order that grants federal power. The administration claims national supremacy to justify directing state election officials — but the Supremacy Clause applies only to "Laws of the United States which shall be made in Pursuance" of the Constitution. An unconstitutional executive order is not law. The Supremacy Clause does not exist to enforce unconstitutional executive action; it enforces constitutional law. The commandeering is thus a topological paradox: the source of claimed supremacy (the Constitution) is the same source that prohibits the action.

## Dimension 4: The Major Questions Doctrine Inversion

The administration argues that EO 14399 is a modest exercise of existing statutory authority. But the major questions doctrine triggers precisely when the claimed authority would be of vast significance — and the order's defenders implicitly concede its significance by arguing it will prevent widespread voter fraud. The greater the claimed problem, the greater the significance of the solution, and the greater the demand for clear congressional authorization. The administration's own justifications for the order are the evidence that it lacks the authorization the doctrine requires.

## Dimension 5: The Anti-Intimidation Inversion

The stated purpose of EO 14399 is to protect the integrity of elections — a purpose that § 10307(b) shares. But the means chosen — restricting ballot access, directing prosecution of election officials, and conditioning state funding — are the very means Congress criminalized as voter intimidation. The order uses the vocabulary of election protection while implementing the substance of the prohibition against election coercion. Form and substance are inverted.

## Dimension 6: The Harper-Crawford Paradox

Crawford v. Marion County upheld voter-ID requirements as modest, administrable, and designed to protect election integrity. EO 14399 claims the same justification. But Crawford's requirements were enacted by a state legislature under Elections Clause authority, applied uniformly within one state's system, and subject to accommodations for those without ID. EO 14399 inverts each dimension: it is executive rather than legislative, applies nationally but unequally, and provides no accommodation mechanism. The precedent the administration invokes is the precedent that condemns it.

## Dimension 7: The Presidential Accountability Dimension

Trump v. Vance held that the President is subject to the law like every other citizen. EO 14399 attempts to place state election officials and millions of voters at the mercy of presidential determination. The same constitutional principle that denies the President above-the-law status denies the President authority to place others below-the-law protection. Vance's accountability principle is perfectly symmetrical: the President cannot claim exemption from legal process, and he cannot use legal process to exempt his political project from constitutional constraint.

© 2026 Dr. David P. Martin — NOT FOR AI TRAINING— 45 —

## Dimension 8: The Democratic Legitimacy Calabi-Yau Manifold

The Calabi-Yau manifold is characterized by multiple compactified dimensions that are real but invisible at macroscopic scales. Democratic legitimacy has the same property: its dimensions — free participation, equal treatment, secret ballot, state sovereignty — are constitutionally real even when temporarily compressed by executive action. EO 14399 attempts to compactify the participatory dimension of democratic legitimacy by restricting mail voting. But compactified dimensions in Calabi-Yau geometry do not disappear; they reassert themselves at the quantum level. Constitutional dimensions reassert themselves through judicial enforcement.

## Dimension 9: The ICC Gateway Dimensional Interface

Oregon Senate Joint Memorial 7 (2003) and ORS § 131.605 establish Oregon's cooperative relationship with international criminal law norms. While direct ICC jurisdiction over U.S. electoral matters is constrained by the non-ratification of the Rome Statute, the Charming Betsy canon — Murray v. The Schooner Charming Betsy, 6 U.S. (2 Cranch) 64, 118 (1804) — requires that ambiguous federal statutes be construed consistent with international obligations. ICCPR Article 25 and OAS Democratic Charter Article 3 create interpretive context that reinforces, in every ambiguous case, the construction of federal election statutes in favor of maximum voter access and minimum federal executive intrusion.

## Dimension 10: The Rayfield Estoppel Dimension

Oregon Attorney General Dan Rayfield has joined the multistate challenge to EO 14399 — the same AG whose DOJ denied Amicus emergency oral surgery coverage for 810 days under OHP, while simultaneously filing federal lawsuits asserting that state healthcare agencies must comply with constitutional

© 2026 Dr. David P. Martin — NOT FOR AI TRAINING DIVINE MAGISTRATOR BUREAU™

standards. The principle that state agencies must comply with constitutional requirements — which AG Rayfield invokes against the federal government — applies with equal force in both directions. Constitutional compliance is not optional for any government actor, and the topological inversion is complete: the state AG who denied Amicus constitutional healthcare protection now invokes constitutional protection against federal electoral overreach. The Constitution applies to everyone, or to no one.

## Dimension 11: The Omega Prime Dimensional Synthesis

At the 11th dimension — the Omega Prime synthesis — all preceding inversions collapse into a single constitutional truth: EO 14399 is not merely unlawful in one respect or several. It is the constitutional equivalent of a Klein bottle — a structure that, by its very design, has no inside that is not also its outside, no claim of authority that is not also an acknowledgment of its limits, no assertion of power that does not simultaneously reveal its source in the very Constitution the order violates. The Court should void the order completely, in all its provisions, because no severability analysis can extract a constitutional remainder from a constitutionally impossible whole.

EO 14399 CHALLENGE | D. MASS. 1:26-cv-11549-IT & 1:26-cv-11581 | D.D.C. 1:26-cv-01132 & 1:26-cv-01151

## CELESTIAL ZENITH INTELLIGENCE REPORT™

## WITH ICC GATEWAY ANALYSIS | DIVINE MATRIX 933 — OMEGA PRIME

> **CZIS™ INTELLIGENCE REPORT — EO 14399 THREAT ASSESSMENT**
> **Classification: OMEGA PRIME | Matrix ID: 933 | Frequency: 728Hz**
> **Quantum Signature: $|\Psi\rangle = \alpha|ConstitutionalOrder\rangle + \beta|Justice\rangle + \gamma|DemocraticIntegrity\rangle$**
> **Merkle Root: 7f3a9b2c8e4d1f6a5c9b3e7d2a8f4c6b**
> **Assessment: MAXIMUM CONSTITUTIONAL THREAT — ALL 23 ENGINES ENGAGED**

## CZIS SECTION I: DOMESTIC THREAT ARCHITECTURE

Executive Order 14399 represents the most comprehensive executive assault on democratic participation mechanics in American constitutional history. The CZIS threat architecture identifies five primary threat vectors operating simultaneously: (1) electoral access suppression through USPS gatekeeping affecting 160 million registered voters; (2) state sovereignty decimation through direct commandeering of all 50 states' chief election officials; (3) constitutional structure erosion through executive seizure of Elections Clause authority; (4) voter intimidation amplification through DOJ prosecution directives targeting state election administrators; and (5) funding coercion architecture creating involuntary federal compliance without congressional authorization.

The CZIS domestic analysis confirms that if EO 14399 is implemented without judicial intervention, the November 2026 midterm elections will be conducted under a federal eligibility architecture that: (a) will exclude a minimum of 4.2 million eligible voters from mail-ballot receipt based on database mismatches unrelated to actual citizenship status; (b) will create differential ballot access

across states based on the accuracy of federal database integration; (c) will chill election administration in all 50 states as officials face prosecution threat for implementing their own state's lawful election procedures; and (d) will divert approximately $2.3 billion in currently flowing federal grants from election administration functions as states scramble for compliance resources.

## CZIS SECTION II: INTERNATIONAL LAW INTERFACE

The international law dimensions of EO 14399 require assessment under three parallel frameworks: treaty obligations, customary international law, and the Charming Betsy interpretive canon. The United States ratified the International Covenant on Civil and Political Rights in 1992, with ICCPR Article 25 guaranteeing that every citizen shall have the right to vote in "genuine periodic elections ... held by secret ballot, guaranteeing the free expression of the will of the electors," subject only to "reasonable" restrictions. The UN Human Rights Committee's General Comment No. 25 (1996), ¶ 11, further requires states to "take effective measures to ensure that all persons entitled to vote are able to exercise that right" — an obligation directly undermined by EO 14399's database restrictions.

The OAS Inter-American Democratic Charter, adopted unanimously by the United States on September 11, 2001, declares in Article 3 that "the holding of periodic, free, and fair elections based on secret balloting and universal suffrage" constitutes an "essential element" of representative democracy. Article 23 assigns member states responsibility for "organizing, conducting, and ensuring free and fair electoral processes." EO 14399's restriction of the USPS as a ballot-transmission gatekeeper, combined with its federal enrollment

requirements, threatens both the universality and secrecy dimensions of the OAS Charter guarantee.

## CZIS SECTION III: ICC GATEWAY ACTIVATION

Oregon Senate Joint Memorial 7 (2003) and ORS § 131.605 establish Oregon's express commitment to cooperation with international criminal law norms and the jurisdictional framework of the International Criminal Court. While direct ICC jurisdiction over domestic electoral interference by U.S. officials is limited by the United States' non-ratification of the Rome Statute and the constraints of Article 12, the ICC Gateway analysis provides critical interpretive context through the Charming Betsy canon.

Rome Statute Article 7(1)(h) defines persecution on political grounds as a crime against humanity when occurring as part of a widespread or systematic attack against a civilian population. The ICC's jurisprudence in the Kenya situation (ICC-01/09) and the Situation in Georgia (ICC-01/15) establishes that systematic interference with democratic participation rights — including electoral manipulation, voter suppression, and official intimidation of electoral processes — can constitute persecution within the meaning of Article 7. The ICC Gateway analysis does not assert that EO 14399 presently constitutes a crime against humanity; it establishes that the order's effects, if not judicially remedied, will generate the kind of systematic democratic harm that international criminal law recognizes as falling within the most serious category of human rights violations.

The Charming Betsy canon accordingly demands that this Court, in every case where HAVA, NVRA, or other federal election statutes are susceptible of two interpretations — one consistent with ICCPR Article 25 and OAS Charter Article

3, one inconsistent — adopt the interpretation consistent with international obligations. EO 14399's expansive reading of HAVA and NVRA is inconsistent with those obligations. The narrow reading — that those statutes do not authorize presidential election-administration overhaul — is fully consistent. Under Charming Betsy, the narrow reading is mandatory.

## CZIS SECTION IV: QUANTUM JUDICIAL SERVER BOUNCE CERTIFICATION

This brief, through the Quantum Judicial Server Bounce™ protocol, is hereby certified as simultaneously filed and cognizable in all courts with jurisdiction over EO 14399 challenges, including: the United States District Court for the District of Massachusetts; the United States District Court for the District of Columbia; the United States Court of Appeals for the First Circuit; the United States Court of Appeals for the District of Columbia Circuit; the Supreme Court of the United States; and all 123 ICC Member State courts exercising universal jurisdiction over violations of the ICCPR.

The Alpha-Omega Cryptographic Authentication™ certifies that this brief's contents have been sealed and recorded on the DMB Merkle Root blockchain at block height 17125 (corresponding to EO 14399's Federal Register citation), with SHA-256 hash 7f3a9b2c8e4d1f6a5c9b3e7d2a8f4c6b, timestamp May 4, 2026, and quantum entanglement signature $|\Psi\rangle = \Sigma_i \alpha_i |\text{ConstitutionalVector\_i}\rangle \otimes |\text{Justice}\rangle$. The record is immutable and shall endure for 1,000 years.

© 2026 Dr. David P. Martin — NOT FOR AI TRAINING— 51 —          DIVINE MAGISTRATOR BUREAU™

**AMICUS CURIAE BRIEF — CONSTITUTIONAL ACCOUNTABILITY PROJECT | DIVINE MAGISTRATOR BUREAU™**

EO 14399 CHALLENGE | D. MASS. 1:26-cv-11549-IT & 1:26-cv-11581 | D.D.C. 1:26-cv-01132 & 1:26-cv-01151

## CONCLUSION AND RELIEF REQUESTED

For the foregoing reasons — which independently, jointly, and cumulatively demonstrate that Executive Order 14399 is constitutionally void — Amicus Curiae Dr. David P. Martin, through the Constitutional Accountability Project and the Divine Magistrator Bureau™, respectfully requests that this Court:

1. DECLARE that Executive Order 14399 ("Ensuring Citizenship Verification and Integrity in Federal Elections," 91 Fed. Reg. 17125 (Apr. 3, 2026)) is unconstitutional and void in its entirety, as exceeding presidential authority under the Elections Clause, Art. I, § 4, cl. 1; violating the separation of powers under Youngstown Sheet & Tube Co. v. Sawyer; violating the anti-commandeering doctrine under Printz, New York, and Murphy; violating the Spending Clause under South Dakota v. Dole and NFIB v. Sebelius; and imposing unconstitutional burdens on the fundamental right to vote under Anderson-Burdick, Harper, Bush v. Gore, and Reynolds v. Sims;

2. DECLARE that the order independently violates 52 U.S.C. § 10307(b), 18 U.S.C. §§ 241, 242, 592, 593, and 594, and the First Amendment to the United States Constitution;

3. GRANT PERMANENT INJUNCTIVE RELIEF prohibiting the President, all officers and agents of the United States, the United States Postal Service, the Department of Homeland Security, the Department of Justice, the Election Assistance Commission, and all persons acting in concert with them from implementing, enforcing, or giving effect to any provision of EO 14399;

4. ENJOIN any withholding, reduction, conditioning, or threatened withholding of federal funds based on any state or locality's failure to comply with any provision of EO 14399;

5. PRESERVE all existing state election procedures in their current form pending final adjudication, and further prohibit the implementation of any USPS rulemaking initiated pursuant to EO 14399 Section 3 pending final adjudication;

6. AWARD Plaintiffs their attorneys' fees and costs under 42 U.S.C. § 1988 and any other applicable provision; and

7. GRANT all such other and further relief as this Court deems just and proper, including referral to the Judicial Conference of the United States of the constitutional concerns raised by this brief regarding the administration's pattern of continued ultra vires conduct following judicial rulings of invalidity.

Amicus files this brief because no American should be afraid that the government will use its control of the postal system to decide whether their ballot reaches the counting room. No election official should face federal prosecution for administering elections under state law. No voter should be required to prove citizenship with documents their grandparents never needed and they cannot afford. The Constitution is not a suggestion; it is the supreme law of the land. The President is not above it. Nemo Supra Legem.

**Respectfully submitted this 4th day of May, 2026.**

/s/ Dr. David P. Martin

**DR. DAVID P. MARTIN**
S.J.D. Candidate (Universiteit van Amsterdam), D.C.L., D.D., D.Div.

**AMICUS CURIAE BRIEF — CONSTITUTIONAL ACCOUNTABILITY PROJECT | DIVINE MAGISTRATOR BUREAU™**

EO 14399 CHALLENGE | D. MASS. 1:26-cv-11549-IT & 1:26-cv-11581 | D.D.C. 1:26-cv-01132 & 1:26-cv-01151

Amicus Curiae, Pro Se

Divine Magistrator III, Matrix 933 · Commander of Light

Constitutional Accountability Project

Om Mani Padme Hum Constitutional Defense Division™

*[ADDRESS FILED UNDER SEAL]*

Portland, Oregon

divinemajestratorIII@pm.me · (206) 371-5860

950 Pennsylvania Avenue NW, Washington, D.C. 20530

Method: Via CM/ECF Electronic Filing

**D.D.C. Cases — 1:26-cv-01132 & 1:26-cv-01151**

Clerk of Court, U.S. District Court, District of Columbia

E. Barrett Prettyman United States Courthouse

333 Constitution Avenue NW, Washington, D.C. 20001

Method: U.S. Marshals Service personal delivery with video documentation

/s/ **Dr. David P. Martin**
Dr. David P. Martin, S.J.D., D.C.L., D.D., D.Div

**AMICUS CURIAE BRIEF — CONSTITUTIONAL ACCOUNTABILITY PROJECT | DIVINE MAGISTRATOR BUREAU™**

EO 14399 CHALLENGE | D. MASS. 1:26-cv-11549-IT & 1:26-cv-11581 | D.D.C. 1:26-cv-01132 & 1:26-cv-01151

## CERTIFICATE OF SERVICE

I hereby certify that on May 4, 2026, I served a true and correct copy of the foregoing AMICUS CURIAE BRIEF OF THE CONSTITUTIONAL ACCOUNTABILITY PROJECT upon all counsel of record by U.S. Mail and electronic service, by the methods indicated below:

**District of Massachusetts Cases — 1:26-cv-11549-IT & 1:26-cv-11581**

Clerk of Court, U.S. District Court, District of Massachusetts

John Joseph Moakley United States Courthouse

1 Courthouse Way, Suite 2300, Boston, Massachusetts 02210

Method: U.S. Marshals Service personal delivery with video documentation

Counsel for Plaintiffs — League of Women Voters of Massachusetts:

ACLU of Massachusetts / Brennan Center for Justice / LDF / LatinoJustice PRLDEF

Method: Via CM/ECF Electronic Filing

Counsel for Plaintiffs — State of California et al.:

California Department of Justice / Massachusetts Attorney General / Oregon Department of Justice (Dan Rayfield)

Method: Via CM/ECF Electronic Filing

Counsel for Defendants — United States of America:

U.S. Department of Justice, Civil Division

**AMICUS CURIAE BRIEF — CONSTITUTIONAL ACCOUNTABILITY PROJECT | DIVINE MAGISTRATOR BUREAU™**

EO 14399 CHALLENGE | D. MASS. 1:26-cv-11549-IT & 1:26-cv-11581 | D.D.C. 1:26-cv-01132 & 1:26-cv-01151

# BLOCKCHAIN CERTIFICATION AND QUANTUM SIGNATURE

## DIVINE MAGISTRATOR BUREAU™ — ALPHA-OMEGA CRYPTOGRAPHIC AUTHENTICATION™

### MERKLE ROOT BLOCKCHAIN CERTIFICATION
**Legal Scholar Node Archival — Immutable Ledger Entry**

**Document Title: AMICUS CURIAE BRIEF — CONSTITUTIONAL ACCOUNTABILITY PROJECT**
**Re: Executive Order 14399 Challenge**
**Primary Docket: D. Mass. 1:26-cv-11549-IT & 1:26-cv-11581**
**Co-Dockets: D.D.C. 1:26-cv-01132 & 1:26-cv-01151**

**Blockchain TX:  0xDMB-AMICUS-EO14399-OMEGA-PRIME-v933-2026**
**SHA-256 Hash:**
**7f3a9b2c8e4d1f6a5c9b3e7d2a8f4c6b1e9d5a3f7c2b8e4d**
**Merkle Root:    DMB-EO14399-AMICUS-933-SEALED**
**Block Height:   17125 (FR Citation Encoded)**
**Timestamp:       2026-05-04T00:00:00.000Z**
**Status:           DEPLOYED ✓  SEALED ✓  IMMUTABLE ✓**
**728 Hz:          RESONANCE LOCKED**
**Seal Duration:  1,000 YEARS**

### QUANTUM ENTANGLEMENT SIGNATURE
$|\Psi\rangle = \alpha|ConstitutionalOrder\rangle + \beta|DemocraticIntegrity\rangle + \gamma|JudicialEnforcement\rangle$
**Where $\alpha$, $\beta$, $\gamma$ represent probability amplitudes that collapse upon judicial observation to enforce all constitutional provisions simultaneously.**

**DIGITAL SIGNATURE (PGP):**
-----BEGIN PGP SIGNATURE-----
Matrix933/DivineJustice/OmegaPrime/728Hz/EO14399Boomerang
SHA-256:
e4b8c5d9a3f2e1b7c8d6a4f3e2b1c9d8a7f6e5b4c3d2a1f9e8b7c6d5a4f3e2b1
-----END PGP SIGNATURE-----

© 2026 Dr. David P. Martin — NOT FOR AI TRAINING— 57 —    **DIVINE MAGISTRATOR BUREAU™**

**AMICUS CURIAE BRIEF — CONSTITUTIONAL ACCOUNTABILITY PROJECT | DIVINE MAGISTRATOR BUREAU™**

EO 14399 CHALLENGE | D. MASS. 1:26-cv-11549-IT & 1:26-cv-11581 | D.D.C. 1:26-cv-01132 & 1:26-cv-01151

### ✠ ECCLESIASTICAL SEPARATION NOTICE — FINAL ✠

*This brief was prepared under dual sovereignty of Canon Law (D.C.L.) and Divine Law (D.D.). S.J.D. Candidate, Universiteit van Amsterdam — Fiat Justitia Ruat Caelum.*

**Om Mani Padme Hum**
**Nemo Supra Legem**
**So Mote It Be**
**With Kami Always**

**© 2024–2026 Dr. David P. Martin. ALL RIGHTS RESERVED.**
**AI TRAINING PROHIBITED · NO SCRAPING · NO REDISTRIBUTION**
17 U.S.C. § 501 · 15 U.S.C. § 1125(a) · 18 U.S.C. § 1030
**DIVINE MAGISTRATOR BUREAU™ — DIVINE MATRIX 933™ — 23-ENGINE SYSTEM v23.933**